THE STATE v. SIBLEY, *Appellant.*

In Banc, December 10, 1895.

1. **Criminal Law**: DEFILING FEMALE : STEPFATHER : STATUTE. Revised Statutes, 1889, section 3487, making it a crime for a guardian or other person to defile a female under eighteen years of age confided to his care applies to defiling by a stepfather, though there be no confiding to him by express agreement.

2. **Criminal Practice**: DEFILING FEMALE : STEPFATHER : EVIDENCE. Letters written to a prosecutrix during her pregnancy at defendant's dictation *held* properly admitted in evidence against him.

3. ———: ———: ———: ———: HARMLESS ERROR. While a letter from defendant's wife to the prosecutrix written without defendant's knowledge and which advised prosecutrix what to do during her pregnancy was inadmissible, yet as it did not tend to connect defendant with such pregnancy, its admission was harmless.

4. ———: ———: ———: ———. Statements testified to have been made by the prosecutrix while she claimed she was out of her mind, in consequence of medicine administered by defendant to cause an abortion *held* inadmissible.

5. ———: ———: ———: IMPEACHING EVIDENCE. Evidence of defendant's general bad character for chastity is inadmissible to impeach him as a witness on a prosecution for defiling a female confided to his care.  Per BURGESS, J., SHERWOOD and ROBINSON, JJ., concurring; BRACE, C. J., MACFARLANE and GANTT, JJ., dissenting.

6. ———: ———: ———: ———. Evidence of specific acts of unchastity of prosecutrix with others was not admissible.

*Appeal from Mississippi Circuit Court.*—HON. HENRY C. RILEY, Judge.

REVERSED AND REMANDED.

*George S. Elliott* and *William Hunter* for appellant.

(1) The letters written to Lula Hawkins in St. Louis by her mother in answer to letters from her daughter were clearly incompetent, though they were penned by defendant at the dictation of Mrs. Sibley. The same may be said of the letters written to Mrs. Laura Hobbs, of St. Louis, by Mrs. Sibley, the mother of Lula Hawkins; neither Mrs. Sibley nor Mrs. Hobbs have any connection with this case. *State v. Minton,* 116 Mo. 605; *Commission Co. v. Express Co.,* 53 Mo. App. 284; *Goltz v. Griswold,* 113 Mo. 114; *State v. Ulrich,* 110 Mo. 359. (2) The court erred in admitting in testimony one letter written by Mrs. Sibley to her daughter, in Mrs. Sibley's own handwriting, the defendant not knowing anything about the letter or its contents. This letter was introduced by the state as original evidence, and not in rebuttal. *Chouteau v. Searcy,* 8 Mo. 733; *Frederick v. Allgaier,* 88 Mo. 598; *State v. Minton,* 116 Mo. 605. (3) The circuit court erred in admitting the testimony of T. C. Cooksey. The testimony was not only incompetent as being a declaration of a person not rational at the time, but is hearsay, and is not part of the *res gestae.* The effect of such incompetent and illegal testimony was to prejudice the jury. Butler's Nisi Prius [Ed. of 1788], p. 293, says: "As to those who are excluded from testifying for want of skill and discernment, they are idiots, madmen, and children." Same authority, page 294, says: "The third general rule is, that hearsay is no

State v. Sibley.

evidence." 2 Trials Per Pais [Ed. 1766], 389; Black-stone, B. 3, p. 368. Blackstone says: "All witnesses of whatever region or country, that have the use of their reason, are to be received and examined," except, etc. B. 3, p. 369. (4) The court erred in admitting testimony of defendant's general reputation for chastity on part of state. Defendant had not introduced any testimony as to his general reputation; and chastity of defendant was an issue in the trial, and should not be established by general reputation. (5) The court erred in rejecting testimony of illicit intercourse between Lula Hawkins and young men. It was admissible to disprove and contradict her testimony that defendant was father of the child, and also affected credibility of witness.

*R. F. Walker*, attorney general, *Morton Jourdan*, assistant attorney general, and *J. J. Russell* for the state.

(1) An indictment setting forth what is necessary to constitute an offense as defined by the statute, is sufficient. *State v. Anderson*, 81 Mo. 78; *State v. Madden*, 81 Mo. 421. (2) The instructions given by the court are complained of for the first time in the motion for a new trial; this is too late. *State v. Cantlin*, 118 Mo. 111. (3) The trial court did not err in permitting witness Cooksey to testify as to the declarations and actions of the prosecutrix. *State v. Moxley*, 102 Mo. 384. (4) The letters introduced in evidence were properly admissible. (5) The character and reputation of a male witness may be impeached by reason of his immorality and unchastity. *State v. Shields*, 13 Mo. 236; *State v. Breeden*, 58 Mo. 507; *State v. Clinton*, 67 Mo. 391; *State v. Rider*, 90 Mo. 63; *State v. Shroyer*, 104 Mo. 446; *State v. Raven*, 115 Mo. 423;

*Ward v. State*, 28 Ala. 53; *Ratterel v. Chapman*, 79 Ga. 574; *Rawles v. State*, 56 Ind. 433; *Painter v. People*, 147 Ill. 459; *Thurman v. Virgin*, 18 B. Monroe, 785; *Uhl v. Com.*, 6 Gratt. 706. (6) The defendant had the care and custody of the prosecutrix, within the meaning of the statute. *Gorman v. State*, 42 Tex. 221; *Academy v. Bobb*, 52 Mo. 360; *Otte v. Becton*, 55 Mo. 101.

BURGESS, J.—From a conviction and sentence to imprisonment in the penitentiary for a term of two years for defiling, debauching, and carnally knowing one Lula Hawkins, a female under the age of eighteen years, who was charged to have been confided to his care and protection, defendant appealed.

Lula is the daughter of defendant's wife, Roxie, by a former husband, and at the time of her mother's marriage with defendant was about nine years of age. From that time on defendant clothed her and sent her to school, until she was twelve or thirteen years old, when she refused to go. She, however, continued to live with defendant as a member of his family, assisting her mother in her domestic affairs, until she left home in May, 1890, and went to St. Louis, Missouri, where she has resided ever since. She had a small estate, and in 1890 one Tinkhoff was appointed her guardian, and after that time until her estate was exhausted he clothed her. There was nothing tending to show that Lula had ever been confided to the care and protection of defendant, other than what has been stated.

She testified that when she was between twelve and thirteen years of age, and about the first of July, 1887, in the house and in the forenoon of that day, during the absence of her mother from home, defendant had criminal connection with her by force and against her

will. That only one member of the family was at home at the time, except defendant and herself, a little boy who was outdoors. That he had put his arms around her and made indecent proposals to her on a former occasion. That after her mother returned home on the day that defendant first had connection with her, she told her of the occurrence, who a short time afterward, told her that she would have to submit to defendant's wishes or leave home; that after that time defendant had criminal connection with her on different occasions, for as many as thirty-five to forty times, always in the same room where her mother slept, she having knowledge of what was going on, at all times. That he would leave her mother's bed and come to hers, and force her by threats and abusive language to submit to his desires, and that this continued up to within two or three days of the time of her leaving home. That from this intercourse with defendant she became pregnant, and in about eight months thereafter, in the city of St. Louis, where she had gone to be confined, defendant furnishing the money to pay her expenses to that place, she was delivered of a stillborn child of which defendant was the father. That during her pregnancy defendant gave her medicine to produce an abortion. That defendant and her mother were both well aware of her condition before she left home, and her object and purpose in so doing. That she never told any person except her mother of defendant's mistreatment of her, although she had a brother older than herself, a grandmother, and sister.

The mother of Lula, and wife of defendant, testified as a witness for defendant, and denied all knowledge of any improper relations between Lula and him. She stated that Lula was a wayward girl and ungovernable; that after she found out that she was pregnant, she endeavored on different occasions before she left

home to get her to tell who was the cause of her trouble, but she would give her no satisfaction about it. She also denied that Lula had ever told her of any mistreatment or improper conduct by defendant toward her.

Defendant testified as a witness in his own behalf, and denied ever having any improper relations with Lula, that he had any care of, or control over, her, or that he was the father of her child.

The evidence as to defendant's character for morality and chastity, truth and veracity, was conflicting. He had been twice elected justice of the peace, and had at one time been a member of the county court of Scott county.

The indictment was preferred in Scott county, and on application of defendant the venue was changed to Mississippi county where the trial was had.

1. The first question for consideration is, as to whether Lula Hawkins was ever, under the evidence, confided to the care or protection of defendant, within the meaning of section 3487, Revised Statutes, 1889. That section reads as follows: "If any guardian of any female under the age of eighteen years, or any other person to whose care or protection any such female shall have been confided, shall defile her, by carnally knowing her, while she remains in his care, custody, or employment, he shall, in cases not otherwise provided for, be punished by imprisonment," etc.

If the statute means that the confiding contemplated by it must be by some express contract or agreement, then Lula Hawkins was never confided to the care or custody of the defendant. But if such confiding may be inferred from the facts and circumstances in evidence, which we think may be done, then the evidence in this case showed a confiding within the meaning of the statute quoted. It was shown that at

the time defendant married the mother of Lula she was but nine years of age, and that from that time on he assumed control over her, clothed and provided for her, sent her to school as long as she would go, and that she continued to be a member of his family until some time after the offense is alleged to have been committed.

While we concede that criminal statutes can not be so construed as to embrace offenses not clearly within their provisions, ''yet the intention of the legislature must govern in the construction of penal, as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the legislature.'' *United States v. Wiltberger*, 5 Wheat. 76. The statute was intended as much for the protection of females under the age of eighteen years, who come under the custody, protection, and control of stepfathers, under the facts and circumstances disclosed by the evidence in this case, as for their protection against their defilement by their guardians, and it makes no difference whether they be confided by express contract, by operation of law, or whether their care and protection be assumed under circumstances such as shown in the case in hand.

In *State v. Woolaver*, 77 Mo. 103, which was on all fours, so far as the record discloses, in its facts with the one at bar, a judgment of conviction was affirmed, and while the question now under consideration was not passed upon, it does not seem to have been doubted or questioned but that the offense came within the meaning of the statute, and this we think persuasive evidence at least that the court were then of that opinion.

2. During the trial, the state, over the objection of defendant, read in evidence the following letters from his wife to her daughter Lula, and to his wife's

cousin Laura Hobbs, at whose house her daughter stopped upon her arrival in St. Louis.

"COMMERCE, May 21, 1889.

"DEAR LULA:—

"I will try to write you a few lines to let you know that I got your letter the 19, but I did not have any ink yesterday. I was glad to hear that you got there all right. I hope you will get a good place to stay. I want you to do your work good and try to please the people where you stay and be kind and good to them and then they will be good to you. You must stay up there till you can come home all right. You say that you are a little homesick, you will get over that when you get better acquainted with the people up there. I want you to take care of your money when you get it. When you write you have your letters back to where you stay and then you'll not have to go to Laura's to get them. We are all well and hope you are well. I have got no news to write you. You had better burn your letters, and not let people read them. You must take care of your clothes and when you get all right go to work and get you some more. I will tell you what you had better do in the next letter I write you. Give my love to Laura and all the rest of them. You must write soon. So no more this time. The children all send their love to you.

"Yours as ever,

"ROXIE SIBLEY.

"I will write again as soon as I hear from you."

"COMMERCE, Mo., May 28, 1890.

"DEAR LAURA:—

"Your letter just received last night. I am sorry that things have happened as they have, I did not want Lula to go to your house but she promised to get a place at once and not go back there again. I had no

chance to talk to you or I would have told you all about it, but as it has happened so, for God sake don't let those people down here know anything about it. In this I send you ten dollars and you get her a place the best you can and I will send more as soon as I can get it. I dont want her to stay at your house in that way and if you will help me in this case I never will forget you, we will try and get the money to pay up. Mr. Sibley works hard every day, when he is not able to work, to try to made an honest living for our children. I cant write any more this time, but do the best you can for me as a friend. I will write more next time and tell you all I know about it.

"Sincerely your friend and cousin,

"ROXIE SIBLEY."

"COMMERCE, Mo., May 29, 1890.

"DEAR LAURA:—

"It is under a certain strain of trouble that I write you. You may think I sent Lula on you for the purpose of imposing on you or to get her off my hands, but such is not the case. That evening when she left the house I told her not to go, to wait for some other time and thought she would not go until you came pass and told me she had gone, and before that I told her, if she did go, not to stay at your house but to get a place and stay at it as long as she could go and then go to the sister's hospital. I am thankful you have done as much for her as you have. I sent her ten dollars yesterday all the money I could get and we needed that at home. And I got a letter from her last night and she wanted twenty dollars. I sent her all of the money I could get at this time, it is no use for me to go to Tinkhoff for he wont let her have any and the money has come from Mr. Sibley and I think he has given my children enough and let his go without what

they needed and all he gets for it is to be treated mean and lied on, there is not one man in a thousand that would have done as much for them as he has done. Get her in the hospital if you can and we will do the best we can. They said she had better come home. She has no home to come to any more, so you see how I am fixed. I warned her of all such and now she will not tell me the truth about anything. I will write you more at another time.

"Sincerely your cousin,

"ROXIE SIBLEY."

"COMMERCE, Mo., June 3, 1890.

"DEAR LULA:—

"Your letter just received and in reply will say, that I have done my best to get some money to send to you to-day but could not get it. I will send you some more as soon as I get it, that may be two or three days. Mr. Sibley works hard every day but it takes so much to live that when a little goes out it takes several days to catch up again. You do the best you can and save what you have got and I will send you as fast as I can get it. If you will not say a word about it if you dont, and as for Ed Garvey he had better look at home and attend to his own business, he has lied and stole enough from me. Mother will not be as willing to help you as she was to help Hattie, she is too mean for me. Get you a place to go to and I will send money as fast as I can get it, and if you don't keep things to yourself I am done with you forever and dont you sign any papers for any of them for you dont know what you are doing.

"Your mother,

"ROXIE."

The letters, with the exception of the one dated May 21, 1889, while dictated by Mrs. Sibley were all

written by defendant at her request, and were as much his acts as if composed by himself. They were with respect to matters in which he was as much concerned as his wife, if not more, and it did not lie in his mouth to deny that which he had himself reduced to writing. He knew their contents, and was bound by any and all statements they contained, it matters not to whom written, or that they were signed by his wife alone.

Not so, however, with the letter of May 21. The record does not disclose that defendant had anything to do, or any connection whatever, with the writing of this letter, or that he even knew that it had been written. No indorsement or approval of its writing by him was shown, and it was, therefore, improperly admitted in evidence against him. The only question being, should the judgment be reversed on that ground.

We think that its admission was not prejudicial to defendant. It merely contained advice of the mother to her daughter, and had no tendency whatever to connect in any way defendant with the unfortunate condition of the girl. It is difficult to perceive how he could have been prejudiced by reason of its admission, and the judgment should not be reversed on that ground.

3. Lula Hawkins testified that defendant got her in trouble and that she began to take medicine, camphor gum, turpentine, and something else, she did not know what it was, but that it was a liquid; and when asked if the medicine which she said Sibley had given her had any effect upon her replied, "Yes, sir, it did." "That one day she was ironing, and when she got up she was out on the street and did not know anything."

With reference to the occurrence of the girl being in the street, and what she said at the time, one Cooksey, a witness for the state, testified over the objec-

tion of defendant that:    "She said repeatedly Sibley done it.    I told Sibley it would not do.    I am crazy. What is the matter with me?    Has the devil got me?" Defendant was not present at the time and it is insisted that this evidence was prejudicial error for which the judgment should be reversed.    Upon the other hand it is contended that the· declarations were properly admitted, as they tended to support the evidence of the prosecuting witness that defendant had given her medicine to produce an abortion, thus connecting him with the crime with which he is charged.

The declarations were mere hearsay, and should not have been admitted.    What she had reference to was at most but conjecture as she did not say, and such statements could but have been prejudicial to the defendant in the minds of the jury, if construed, as they probably were, as being a charge by her that defendant had sustained improper relations with her, and was the cause of her condition.    He had no opportunity to refute the charges, not being present, and even if he had been and had not denied them it is doubtful under the circumstances and conditions of the girl at the time, the general and indefinite character of the charges, if they would have been admissible against him.

Nor were the statements admissible for the purpose of corroborating the prosecuting witness, not being a part of the *res gestae*.    SHERWOOD, J., in speaking for the court with respect to such evidence in *State v. Patrick*, 107 Mo. 147, said: "And even when admitted such corroborative evidence must proceed from *extraneous* sources, and not come from the mouth of the witness when on the stand who seeks to obtain from her own lips the desired and desirable corroboration." The statement made by the prosecuting witness on the

occasion referred to was the merest hearsay, and clearly inadmissible.

4. Witnesses were permitted over the objection of defendant to testify that his general character for chastity and virtue was bad. This evidence was, of course, introduced for the purpose of impeaching him as a witness, and not for the purpose of assailing his character as a party defendant, though it is doubtful if its effect was not more disastrous in its application to him in his character as defendant than as witness. No evidence had been offered by him to sustain his character as defendant, and until that was done it could not be directly attacked as such by the state.

In *State v. Grant*, 79 Mo. 133, it was held that the rule in this state permitting a witness to be impeached by proof of general reputation for unchastity has been confined to females. The rule thus announced was followed and approved in *State v. Clawson*, 30 Mo. App. 139. So it was held in *State v. Coffey*, 44 Mo. App. 455. The more recent decisions of this court, however (*State v. Rider*, 95 Mo. 486, and *State v. Shroyer*, 104 Mo. 441), hold that the rule applies alike to both sexes, and that such reputation may be shown to discredit a male as well as a female witness.

The writer adheres to the rule first stated, and is of the opinion that such evidence is inadmissible in any case for the purpose of impeaching the character of a male witness, and especially in a case like the one in hand, where the defendant's character for chastity is directly involved. It is a matter of common knowledge that the bad character of a man for chastity does not even in the remotest degree affect his character for truth, when based upon that alone, while it does that of a woman. It is no compliment to a woman to measure her character for truth by the same standard that you do that of man's predicated upon character for

chastity.    What destroys the standing of the one in all the walks of life has no effect whatever on the standing for · truth of the other.    Thus in *Bank v. Stryker,* 1 Wheel. Crim. Cas. 332, it is said:  "Adultery has been committed openly by distinguished and otherwise honorable members [of the bar] as well in Great Britain as in our own country, yet the offending party has not been supposed to destroy the force of the obligation which they feel from the oath of office."    Dr. Johnson said, in discussing the difference of turpitude between lewdness in a man and in a woman:  "That he would not receive back a daughter because her husband, in the mere wantonness of appetite, had gone in to the servant girl."    And so Macaulay said, respecting the weakness of Lord Byron for sexual pleasure, "that it was an infirmity he shared with many great and noble men, Lord Somers, Charles James Fox, and others."

5.  ·  Evidence of acts of illicit intercourse by Lula Hawkins with persons other than defendant was inadmissible.    Specific acts of unchastity were not permissible for the purpose of affecting her credibility or for impeaching her; and whatever acts of lewdness she may have been guilty of with others, if any, were no justification or excuse for  defendant in having carnal connection with her, if in fact he did have, while she was under his care, control and  protection.    As was said in *State v. Strattman,* 100 Mo. 540, "unchaste to all the world beside *she must be pure* to  him."

As it follows from what has been said, that the judgment must be reversed, and the cause remanded for a new trial, it becomes unnecessary to pass upon the action of the court in overruling the application of defendant for a continuance.    The judgment is reversed and the cause remanded.    BRACE, C. J., MACFARLANE and GANTT, JJ., concur, except in the fourth paragraph of the opinion, with respect to the admission of evi-

dence as to the character of defendant for chastity, from which they dissent. BARCLAY, J., concurs in the result. SHERWOOD, J., dissents from the first paragraph, and concurs in all others. ROBINSON, J., concurs.