THE STATE v. BOAT R. HICKS, Appellant.—3 S. W. (2d) 230.

Division Two, February 18, 1928.

29

30

*W. E. Walsh* and *Eaton, Burroughs & Cavanaugh* for appellant.

*North T. Gentry,* Attorney-General, and *Smith B. Atwood,* Assistant Attorney-General, for respondent.

34

WALKER, J.—The defendant was indicted in the Circuit Court of Jackson County for the murder of one Martin Erickson. Upon a trial defendant was convicted and sentenced to an imprisonment in the penitentiary for life:

The murder occurred in Kansas City, Missouri, on the evening of May 21, 1926. Two women, who testified for the State, witnessed the tragedy. They were, at the time, sitting on a porch of the residence of one of them. They saw, sitting on the doorstep of a building about seventy-five feet away, a man and a woman. The woman screamed, the man caught her by the hand, and they rose and ran towards the door of their house. They were quickly followed by a man, afterwards shown to be the defendant, who as he ran held a pistol in his hand pointed at the man and woman. Just as they reached the door their pursuer shot each of them down. Running up to where they had fallen, he fired five more shots into their prostrate bodies. He then turned and fled.

Attracted by the first shot, two boys, who were playing ball on a lot near at hand, saw the defendant fire the subsequent shots at the fleeing or prostrate couple. A witness, named Golden, followed the defendant as he fled and intercepting him asked what was the matter. The defendant replied that a yellow bastard had stolen his wife and that he would never steal another man's wife. Another witness, named Berger, who heard the shots fired by the defendant, saw the latter fleeing from the scene, and after parking his car followed the defendant several blocks, overtook him and taking him into custody delivered him to the nearest police station. Upon being searched an automatic pistol with two unfired cartridges in the magazine was found on his person. He was held to await the action of the prosecuting attorney, who filed the information upon which the prosecution was based.

A deputy coroner answered the call and repaired to the scene of the tragedy soon after it occurred. He found the dead bodies of the man and the woman lying where one of the women, who had witnessed the shooting, said they had fallen when shot. There were several bullet wounds in the body of each, from which he testified that Erickson, for whose murder the defendant was being tried, and the woman had died. No weapon of any character was found on the bodies of either.

The moving cause of this murder was the infidelity of the woman. Sometime prior to the tragedy she had lived with the defendant as his wife. Becoming enamored of Erickson she left the former and when killed was living with the latter.

The defendant testified that at about six o'clock, P. M., he was walking down the street when he was greeted by a woman's voice. He recognized it as that of his wife, who was sitting on a doorstep with Erickson. She arose and made a step towards the defendant as if to shake hands with him, when Erickson seized her hand and drew her towards the door of the house. As he did so she screamed, and the defendant fired one shot, but does not remember that he shot more than once. The defendant said he shot Erickson because he thought the latter was about to shoot him. He denied that he intended to shoot the woman.

Threats by Erickson against the defendant were testified to by the latter. On one occasion, the night before the defendant's wife left him, he met Erickson on the street and the latter said to him: "You need not be fooling around that woman now, for I am going to have her; and if you want to keep on living you had better stay away from her." On another occasion, as the defendant was alighting from a street car, Erickson stepped up to him and said: "Is your name Boat Hicks?" Defendant said: "Yes," when "Erickson pulled out a little pistol from his hip pocket and said: 'You had better beat it down the street.'"

The bill of exceptions is burdened with much wholly irrelevant matter, which, having been incorporated into the statements of the State and the defendant, tends to confuse rather than enlighten. We will consider such portions of the same as have been preserved by the defendant as material to his defense.

I. The contention is made that the members of the trial jury were not chosen with a due regard for the rights of the defendant, and hence he was not awarded a fair and impartial trial by a jury of his peers, or as stated in our Constitution (Art. 2, Sec. 22) "a public trial by an impartial jury of the county."

The refusal of the trial court to sustain challenges to certain jurors on the ground that they had formed opinions in regard to the

guilt of the defendant is urged as error. These opinions, it was shown, were based on having read newspaper accounts of the killing and from conversations with others, which opinions it would require evidence to remove. This particular phase of the question concerning the qualification of jurors we discussed in State v. Woodard, 309 Mo. 1. c. 27, in which we said in effect that:

"A juror is not disqualified who has read newspaper reports or has talked to persons concerning the case in which he is being examined, if, in reply to inquiries in regard thereto, he states that the information thus obtained will not influence him in rendering a verdict, but that he will be governed by the evidence adduced at the trial. Further than this, if he answers that the information obtained has caused him to form an opinion as to the merits of the case this will not disqualify him if he states that he will be governed by the evidence in reaching his verdict regardless of his former opinion. [State v. Samis, 296 Mo. 1. c. 487; State v. Poor, 286 Mo. 1. c. 656; State v. Herring and Baldwin, 268 Mo. 1. c. 529 and cases; State v. Smith, 228 S. W. 1. c. 1060 and cases.]

"In the Poor case we reviewed the earlier rulings on this question and discussed the large discretion confided in the trial court in the performance of the duty of selecting a trial jury. The conclusion there reached may pertinently be referred to as applicable in the instant case.

"From these cases may be deduced the general rule that when a defendant, to use the quaint phrase of the common-law, 'puts himself upon the country,' the limit of his rights in the selection of the triers of the facts is that they be unprejudiced, or in other words, with that discrimination which should characterize the performance of their duty, that their minds may be open only to the consideration of such facts as are admitted in evidence."

The jurors objected to in this case met this measure and the appellant has no just ground of complaint on this score.

The citizenship in the county of the juror named Carlisle not being questioned, his competency was not affected by the fact that only a few weeks before the trial he had removed to Jackson County from Minnesota. [Sec. 6607, R. S. 1919; State v. France, 76 Mo. 681.]

A juror named Harlow stated that he had conscientious scruples against the infliction of the death penalty. This disqualification was waived by counsel for the State and the juror accepted. Authority for this waiver is found in Section 4012, Revised Statutes 1919, as amended, Laws 1925, page 196.

The objection urged in the brief of the defendant to the latitude allowed the State in the cross-examination of the defendant was not preserved in the motion for a new trial and is not for review.

II. Error is assigned in the introduction of letters and correspondence between the accused and persons affected by the crime. They were written before the crime was committed and tend to throw light on the pertinent issues of the case and were therefore admissible in evidence, especially when in answer to letters previously passing between the parties, and actually received by them. Such letters were admissible even though not signed by the defendant. [State v. Winningham, 124 Mo. 423.] In State v. Sibley, 131 Mo. 519, it was held that a letter written by the defendant at the dictation of his wife was admissible, although the letter was signed only by the wife. To a similar effect is the holding in State v. Adams, 108 Mo. 208.

It was objected that the court erred in admitting a letter written by the deceased woman to defendant's son. The writer asked that it be shown to the defendant, and it was actually shown to and read by him; hence it became in effect a communication from the deceased woman to the defendant himself, and therefore was admissible under the rulings in the cases above cited.

III. The defendant objected to oral testimony of the divorce of the deceased woman from a former husband. This evidence was introduced in rebuttal, and is not an issue in the case, but is merely collateral and in answer to defendant's testimony as to the marriage, and defendant was not prejudiced by its introduction. Where the fact of a divorce is only collateral and is not an issue in a case it may be proved by the parole testimony of one who was present when the decree was rendered. [State v. Caulder, 262 S. W. (Mo.) 1023.] There can be no pretense that this testimony was material to any issue in the case and the only purpose of its introduction in evidence in rebuttal was to show that the decree was invalid and hence the claim that the woman he slew was his wife was unfounded. The discretion of the court in permitting the introduction in evidence of testimony of this character will not be disturbed unless it is manifest that the defendant was thereby prejudiced.

IV. In view of the instruction on reasonable doubt, given at the request of the State, which applied to the entire case, it is not required that an instruction on this subject be given in connection with any particular phase of the defense or applicable in express terms to any specific issue. An instruction is sufficient if it applies the doctrine of reasonable doubt to the whole case. [State v. Arnett, 210 S. W. (Mo.) 1. c. 84 and cases.] The oft-repeated rule is applicable here that instructions are to be read and considered as a whole. [State

v. Hembree, 295 Mo. l. c. 11 and cases; State v. Emory, 246 S. W. (Mo.) 950.]

V. The court gave an instruction for manslaughter which conformed to the requirements of an instruction on this grade of homicide, not only under the statute but the numerous judicial interpretations of the same. The instruction asked by the defendant, therefore, on this subject was properly refused. It may be said in passing that under all of the facts, the defendant was not entitled to the instruction, given by the court, nevertheless it redounded to the defendant's benefit in affording the jury an opportunity to find him guilty of a lesser offense than that charged and he has no cause of complaint in this regard. An error in the giving of an instruction must be prejudicial to furnish a tenable assignment of error. A case directly in point as furnishing a precedent for this ruling is that of State v. Webb, 205 S. W. (Mo.) l. c. 190, and cases, in which it was held that where there was no authority, under the evidence, for the giving of an instruction for manslaughter in a charge of murder and the defendant was found guilty as charged he was not injured and will not be heard to complain.

VI. Malice, as used in the information and the instructions given, was clearly and correctly defined and the trial court did not commit error in refusing the instruction asked by the defendant on this subject.

The errors complained of by the defendant concerning the instructions were not preserved in a manner to authorize their consideration; but a life sentence has been imposed in this case, and we have examined the instructions that the defendant may be afforded every opportunity to secure a review of any error which may have been committed by the trial court in declaring the law to the jury.

VII. Neither in the motion for a new trial nor in the defendant's brief or argument are the alleged objectionable remarks of the prosecuting attorney preserved in such a manner as to entitle them to consideration. To state that such remarks were "highly inflammable and extremely hurtful to the defendant" coupled with conclusions of a like general nature as to their probable effect on the jury, without even indicating what they were, will not enable the court to review them. Further than this, the defendant's presentation of the case does not show what, if any, steps were taken to enable the trial court to remedy the alleged misconduct of the prosecuting attorney at the time.

In this condition of the record we will presume that the remarks complained of were not prejudicial and if so, that the court, in the exercise of that discretion with which it is clothed, would not have permitted them to have been made, and if made that it would have directed that they be not considered by the jury. Any other course would result in an injustice to the court and a disregard of the presumption that always obtains in the absence of evidence to the contrary, as to the legal propriety of judicial proceedings.

VIII. It is assigned as error that the trial court, in ruling upon objections made, discussed matters foreign to the points involved in the objections which were prejudicial to the rights of the defendant. What the remarks were is left to conjecture. It is enough to say that this manner of attempting to preserve and present errors for our consideration is utterly futile. Our province is to consider facts as preserved in the records in determining the existence of error. This contention is therefore overruled.

IX. It is further contended that the court failed to rule upon objections made by counsel for the defendant in the progress of the trial. The record discloses that the court's failure to rule was confined to instances in which repeated objections of the same nature had theretofore been ruled upon. The conduct of the court in this respect left no doubt as to its rulings upon any matter arising in the conduct of the trial, and defendant suffered no injury therefrom.

X. There are no palliating features in this case. It was attempted, possibly not as a defense, but to reduce the grade of the crime, to portray the defendant as an injured, nay an outraged husband, whose wife had been weaned away from him by a seducer; and that the defendant unexpectedly finding them together became inflamed with righteous and uncontrollable indignation, and in destroying the author of his undoing killed his wife.

The extent to which he was undone is shown by his deliberately walking up to where they were lying, dead or dying, and firing four or five additional shots into their bodies. This final act of the defendant is sufficient in itself to put the seal of condemnation upon any effort of the defense to lift this crime out of the category of a ruthless murder. However, the testimony in rebuttal for the State completely dissipated any probative force that may have remained in this defense. It was shown that the woman had not once or twice, but oftener, for short periods, ambled along life's highway in double harness. Not as a reflection, but as an ensampler of her character,

it may be said that her husbands were almost as numerous as the lovers of Catherine II. Not unkindly or to point a moral or adorn a tale, but simply to illustrate her variant moods in regard to matrimony, it may be noted that with her, as with Anne of Austria: "Neither gift or gain, could hold the winking Light of Love, or Fancy's flight restrain."

The defendant was aware of this idiosyncrasy. Armed with this knowledge he must have realized that sooner or later she would leave the kitchen, where she was employed as a cook while he was hunting work, and flit to another flower. After weeks of desultory trystings with Erickson in which there was nothing more hectic than lover's meetings, she abandoned whatever relations she had sustained with the defendant and went to Erickson, and after a marriage ceremony they began living together. This occurred several weeks before the commission of the crime. Defendant's knowledge of these facts, if not evident from her declarations, were rendered patent by Erickson's growl to the defendant, made as one animal to another, when claiming his mate, that defendant "must quit fooling around this woman, that he" (Erickson) "intended to have her." Defendant's delay therefore in resorting to the primal way, the forceful plan that "he may have who has the power and he may keep who can," tends to dispel the effort made to show that his crime was not the result of passion suddenly aroused, but was an act clothed with the indicia of deliberation and premeditation ample to sustain the charge made and the verdict found. Not only these facts but the entire atmosphere of this case shows that instead of the asserted marital relation being sacred it was purely sordid, and it cannot be otherwise designated by the right thinking mind. It was so found by the jury, whose finding, in the absence of prejudicial error, authorizes the affirmance of the judgment. It is so ordered. *Blair, J.,* concurs; *White, P. J.,* concurs in all except Paragraph II.