THE STATE v. DOMONIC EMMA, alias DOMINIC AMMA, Appellant.—
26 S. W. (2d) 781.

Division Two, April 7, 1930.

*A. Canzoneri* and *William Baer* for appellant.

*Stratton Shartel*, Attorney-General, and *Don Purteet*, Assistant Attorney-General, for respondent.

1218

HENWOOD, C.—An information was filed in the Circuit Court of the City of St. Louis by which the defendant was charged with murder in the first degree, one Bennie Amato being the victim of

the alleged homicide. The jury found him guilty of murder in the first degree and assessed his punishment at imprisonment in the penitentiary "for his natural life." He was sentenced accordingly, and, in due course, has perfected an appeal to this court.

The following statement of the evidence offered by the State (with some alterations) is taken from the Attorney-General's brief:

"The homicide occurred in the city of St. Louis on the 15th day of November, 1927, between the hours of twelve and 12:15 o'clock noon. It was a dark, misty, clammy day. The scene of the fatal shooting is laid at or near the corner of High and O'Fallon Streets. O'Fallon Street is laid out in an easterly and westwardly direction, while High Street intersects it from the north and south directions. Twelfth Street parallels High Street a block east of High Street. The principals in the tragedy are Italians, Bennie Amato being the deceased.

"William H. Kocher testified: He was in the hauling business on the day of the tragedy. At about twelve or 12:15 o'clock, noon, of that day, he was driving a truck west on O'Fallon Street, when about midway of the block between Twelfth and High Streets he observed three men standing on the northwest corner of the market square at High and O'Fallon Streets who appeared to him to be in some kind of deep conversation. As he drew near to the men, he saw two of them step from the curb and immediately thereafter heard shooting. Closer observation revealed that they were shooting at the stoutest of the three men, who was the deceased. The deceased had a closed umbrella in his hand and seemed to be waving it in an attempt to ward off the bullets of his assailants. The two men who were doing the shooting were out on the pavement about five feet west of the west curb of the northwest corner of O'Fallon and High Streets, and were about ten feet southeast of the deceased. He saw these two men level their guns and shoot the deceased, who started staggering across the curb into High Street, where he fell, got up, and staggered across to the opposite side of High Street and again fell, on the sidewalk in front of a door which led into a soft-drink parlor. The two men who had done the shooting stood in the street momentarily and then threw their guns at the body of deceased. At this time he had driven up to the corner of High and O'Fallon Streets. One of the men, who had thrown his gun at the body of deceased, passed directly in front of the truck which he was driving. It was necessary for him to stop the truck in order to prevent it from running over or hitting the man. He got a clear view of the face of this man, inasmuch as he stopped momentarily in front of the truck and looked directly at him at a distance of not more than four feet. The man was wearing an overcoat over a gray suit and had his hat in his hand. After he had thrown the gun at the body of the deceased,

he started in a rapid walk east on O'Fallon Street, which ended in a run on Twelfth Street. He identified the defendant as the man who had fired shots at deceased and then threw his gun at the body; also as the man who, without a hat on, had gone past the front of his truck, looking directly at him for a couple of seconds, and then proceeded east on O'Fallon Street at a rapid walk which ended in a run south on Twelfth Street. The deceased, just prior to the fatal shooting, was not making any act of aggression or attempting in any manner to strike the men who shot him, nor did he see anything in his hands other than a closed umbrella, which deceased raised after the shooting commenced in an apparent attempt to ward off the bullets of his assailants. It appeared to him that deceased had turned his back and was in the act of leaving the presence of the two men just immediately before they began shooting. The first time he had seen defendant was about five years previously, having gotten acquainted with him, just casually, around the fruit auction located on Biddle Street; also at the fourteenth block on Thirteenth Street. The occasion for this acquaintance appears to have come about through purchasing, from time to time, some produce from a man who was driving a truck, which had painted on its side a name something like Charley "Garsche" or Charley "Garashia." Upon these occasions, defendant would be on the truck, apparently in the role of an assistant or helper to the man from whom he was purchasing the produce. These purchases would usually take place between six and seven o'clock, mornings. He would see the defendant as much as twice a week, and then perhaps a month or possibly six weeks would pass before he would again see him. These meetings were for a period of six or seven months, that is to say, some five years before he saw him at the scene of the fatal shooting.

"The cross-examination of the witness Kocher revealed that, on defendant's preliminary examination, the witness had testified that he had never seen the defendant prior to the date of the fatal shooting. The shooting occurred on the 15th day of November, 1927. The preliminary examination of the defendant was held on January 20, 1928. The witness, when being cross-examined at the trial with reference to his testimony at the preliminary, admitted that he had testified on the preliminary that he had not seen the defendant before the day of the shooting, but he attempted to explain the contradiction between his testimony on the trial and at the preliminary as follows:

" 'Yes, sir; I did, but it is wrong, because I did (meaning that he had seen the defendant before the day of the shooting). I have spoken to Officer Roach that evening of the shooting, and I told him that—'

"Here an objection of the defendant's counsel was sustained.

"On redirect examination, he testified, over the objection of the defendant, that, at the preliminary hearing when he said he had never seen the defendant prior to the day of the shooting, he did not fully understand the question; that, in the evening of November 15, 1927, he told Officer Roach he had seen the defendant several times, when the defendant worked on a fruit truck in St. Louis, about five years before the day of the shooting; and that, on December 30, 1927, the day of the defendant's arrest, he told Circuit Attorney Wilson, Assistant Circuit Attorney Maroney and Officer Nally he had seen the defendant several times, when the defendant worked on a fruit truck in St. Louis, about five years before the day of the shooting.

"The State then introduced Police Officer Michael Roach, who testified that he had known witness Kocher for about five years, having lived in the same block with him for that period; that he saw Kocher at the scene of the killing and, in the evening of that day had gone to Kocher's house, where he had a conversation with him, relative to the identification of the men who had shot the deceased; that Kocher there told him that he had seen the defendant about five years previously in the neighborhood of 13th Street, between O'Fallon and Cass Avenue, on a truck with a name painted on its side which appeared to be something like Charlie Garasche or Charlie Garashia; that he, Kocher, had bought some produce from the man on the truck, and that the defendant was on the truck at different times, and seemed to be the helper or assistant of the man from whom he (Kocher) had purchased the produce; that Kocher told him that he had not seen the man, meaning the defendant, for about five years; that, as a result of the information Kocher had given him, he located the truck with the name "Garascha" painted on its sides and was later successful in effecting the arrest of the defendant.

"Circuit Attorney Wilson, Assistant Attorney Maroney, and Police Captain Nally, each testified, over the objection of the defendant, that, on December 30, 1927, the day after the defendant's arrest, the witness Kocher told them he had seen the defendant several times, when the defendant worked on a fruit truck in St. Louis, about five years before the day of the shooting.

"John Ikemeyer testified: At the time of the shooting he was standing on the inside of a building on the northeast corner of High and O'Fallon Streets, looking through the window of a door. He saw three men standing at the northeast corner apparently in deep conversation. One of the three, a little fellow who did some of the shooting, seemed to be excited. All three men were standing on the sidewalk. They appeared to have been there at least twenty minutes when deceased shook hands with the other two, turned around, and started over the crossing towards the north. The other

two started west, turned around quickly, jumped out on the crossing and started shooting deceased in the back, who immediately turned around and, with his closed umbrella, apparently tried to ward off the bullets. The man who got shot had his back to his assailants when the first shots were fired. He thought he heard about ten shots in quick succession. When the shooting commenced, he ran back into the building. Coming out shortly thereafter, he saw the two men who had done the shooting throw their guns, and then run east on O'Fallon Street. He had never seen the men who did the shooting prior to that day and could not identify them, catching only a fleeting glance of their faces as they ran. The deceased was on his knees in the center of the street. He got up and walked to the opposite sidewalk, where he fell by a side door and asked the people to call an ambulance. One of the men, who did some of the shooting, picked up the gun which he had thrown at the body of deceased. He could not identify the defendant as one of the men who did the shooting.

"The State introduced other witnesses who were present at the scene of the shooting, but all were unable to positively identify the defendant as one of the men who was shooting at deceased. One of these witnesses, on cross-examination, said that the defendant seemed to be too heavy for the small man and not tall enough for the large man; that is, of the two men who were doing the shooting. Another witness stated that one of the men, who was shooting, was about the same size as the defendant. Another witness, when asked to view the defendant and see whether he was one of the men, testified that the defendant 'was about that height; that is, just in general appearance from the rear. Now, I never got a good look. From the rear, yes, sir; he might be; you know, his build, he might be about that size. But, that is as much as I can say; I never seen the man's face.'

"Dr. W. M. Winn, autopsy physician for the city of St. Louis, made a post-mortem examination of the body of deceased in the afternoon of November 15, 1927. He found a gun shot wound in the right chest, also one in the left femoral artery. These two wounds in his opinion, were the immediate cause of his death. There was a total of six bullet wounds in the body, all of which had passed completely through. The bullet which had cut the femoral artery, the one found in the right chest, had entered the body through the back."

The defendant testified: He had no connection with the killing of Bennie Amato. He had known the deceased ever since their boyhood days and their relations had always been friendly. He had lived in St. Louis for twenty-two years and worked for the Illinois Traction Company nineteen years. He was compelled to quit work, because of sickness, on November 4, 1927, and did not return to work until after his arrest on this charge, which occurred

on December 29, 1927. Dr. Cataldi treated him for lumbago during the month of November, 1927, and called at his residence on November 12th, 15th, 20th, and twice thereafter in November. He was confined to his bed, suffering from lumbago, on November 15th, the day Amato was killed. He never knew a man named Garashia, and never worked on a fruit wagon. He did not know the witness Kocher. He had known the witness Jennie Scalise (hereinafter mentioned) about eight years.

He was corroborated by his wife, as to his employment, his sickness, and his confinement to his bed on November 15th. She also said that she had known Jennie Scalise three years, and that, two days after her husband's arrest, Jennie Scalise told her that she (Jennie Scalise) witnessed the shooting of Amato.

The defendant was corroborated by Dr. Cataldi as to his sickness in November, 1927, and his physical condition on November 15th. He said that he visited the defendant and wrote prescriptions for him on November 12th, 15th and 20th, and that, in his opinion, the defendant was unable to walk on November 12th or 15th.

Vincent Benincasa, pharmacist, identified three prescriptions, filled by him, and written by Dr. Cataldi on November 12th, 15th and 20th. He said that the first two prescriptions were to alleviate pain and the third was a tonic.

Several of the defendant's co-employees corroborated his testimony as to his employment, and as to his sickness and general physical condition during the months of November and December, 1927.

Some of these witnesses and others, including a priest, testified to the defendant's good reputation ''for peace and quiet.'' Jennie Scalise testified: While walking east on the south side of O'Fallon Street and about sixty feet away, she saw two men shooting at the deceased, but did not know either of them. Immediately before the shooting, she saw the deceased standing on the corner, at the intersection of High and O'Fallon streets, with an umbrella in his hand. She saw the deceased shake hands with two men, turn and walk away, and the two men shoot at him. Both men were slender and of fair complexion, one tall, the other shorter. They fired ten or fifteen shots, threw their guns at the deceased, and then ran east. She had known the deceased a year and the defendant eight years. Neither of the men who did the shooting was the defendant, and neither of them had the appearance of an Italian. She did not remain at the scene of the shooting until the police officers arrived, nor report what she saw to the police department. After she read of the defendant's arrest, she told the defendant and his wife that she saw the two men who shot at the deceased, and knew that neither of them was the defendant. She was not acquainted with any of the

State's witnesses, who said they saw the shooting, and did not see any of them at or near the scene of the shooting.

Sam Amato, brother of deceased, testified that he had known the defendant since he (Sam Amato) was a boy, and that the defendant and the deceased "were always friends."

The defendant offered to prove, by the witness Carl Laudicana, that the relations between the defendant and the deceased were friendly, but, upon the objection of the State, this testimony was excluded.

The proffered testimony of the defendant's witness J. T. Catherman, as to the defendant's good reputation "for peace and quiet," was also excluded, on the ground that he was not qualified.

Other pertinent facts and proceedings will be noted in connection with our discussion of the appellate issues.

I. It is urged that the trial court erred in admitting the testimony of the State's witnesses Kocher, Roach, Wilson, Maroney and Nally as to Kocher's prior statements corresponding to his testimony at the trial. We do not agree with counsel for the defendant in this contention.

As shown above, the witness Kocher testified, on direct examination, that he had seen the defendant several times, when the defendant worked on a fruit truck in St. Louis, about five years before the day of the shooting. On cross-examination, he admitted that he had testified at the defendant's preliminary hearing that he had never seen the defendant before the day of the shooting. On re-direct examination, he was permitted to explain his prior contradictory testimony by saying that he did not fully understand the question asked him at the preliminary hearing. And he was permitted to testify that he told Officer Roach, in the evening of November 15, 1927, the day of the shooting, and Circuit Attorney Wilson, Assistant Attorney Maroney and Officer Nally, on December 30, 1927, the day after the defendant's arrest, that he had seen the defendant several times, when the defendant worked on a fruit truck in St. Louis, about five years before the day of the shooting. As to these statements, he was corroborated by the witnesses Roach, Wilson, Maroney and Nally.

As a general rule evidence of prior statements of a witness is not admissible for the purpose of supporting or corroborating his testimony. But, after the witness Kocher had been impeached, on cross-examination, by proof of his contradictory testimony at the preliminary hearing, it was proper to permit him to offer an explanation of his contradictory statements, and to permit him and the corroborating witnesses, Roach, Wilson, Maroney and Nally, to tes-

tify as to his prior statements consistent with his testimony at the trial, for the purpose of rehabilitation. [State v. Maggard, 250 Mo. 335, 157 S. W. 354; State v. Sharp, 183 Mo. 715, 82 S. W. 134; State v. Taylor, 134 Mo. 109, 35 S. W. 92; State v. Whelehon, 102 Mo. 17, 14 S. W. 730; State v. Grant, 79 Mo. 113; State v. Hatfield, 72 Mo. 518.] ''Where a witness is impeached by proof of variant acts or statements, relevant evidence of the witness's prior statements correspondent with his testimony, are admissible for the purpose of rehabilitation.'' [State v. Maggard, supra.] In connection with this case and the other cases above cited, see Hobbs v. State, 133 Ind. 404, which is quoted with approval in State v. Sharp, supra.

True, the witnesses Roach, Wilson, Maroney and Nally should not have been permitted to testify as to the particulars of the statements made to them by the witness Kocher. But, in view of the defendant's given Instruction 6, we do not think the jury could have been prejudiced by their testimony as to such particulars. This instruction advised the jury that the testimony of these witnesses as to statements made to them by the witness Kocher was not admitted as proof of the facts contained in such statements, but solely for the purpose of corroborating the testimony of the witness Kocher as to the making of such statements.

II. It is also urged that errors were committed by the trial court in excluding the testimony of the defendant's witness Laudicana as to the friendly relations between the defendant and the deceased, and in excluding the testimony of the defendant's witness Catherman as to the good reputation of the defendant ''for peace and quiet.''

Remembering that both the State's witness John Ikemeyer and the defendant's witness Jennie Scalise testified that the deceased shook hands with his assailants immediately before he left them and started across the street, when they began shooting at him, and remembering that both the defendant and his brother testified that the defendant's relations with the deceased were always friendly, it can hardly be said that the exclusion of the witness Laudicana's testimony as to the friendly relations between the defendant and deceased was prejudicial, even though it be conceded that his testimony was improperly excluded.

The same may be said of the trial court's action in excluding the testimony of the witness Catherman as to the defendant's good reputation ''for peace and quiet;'' that is, conceding this witness's qualifications to give such testimony, the exclusion thereof cannot be regarded as prejudicial, when it is remembered that several other

witnesses did testify that the defendant's general reputation "for peace and quiet" was good.

In other words, the proffered testimony of both of these witnesses was merely cumulative.

III. The defendant also complains of the refusal of his Instructions I, IV and V.

Instruction I says, in substance, that, in order to justify the conviction of the defendant, his identity as the person who shot and killed the deceased must be proved beyond a reasonable doubt. The issue of identification was submitted, in effect, not only by Instruction 3, which directed the jury to convict the defendant, if they found he shot and killed the deceased, and, unless they so found, to acquit him, but also, in effect, by Instruction 4, which explained the defense of *alibi* and directed the jury to acquit the defendant, if the evidence left in their minds a reasonable doubt as to his presence at the place where the offense was committed at the time of the commission thereof.

Instructions IV and V relate to the rule of reasonable doubt and the presumption of innocence, respectively, both of which matters were embodied, in approved form, in Instruction 7.

Having given all necessary instructions on the issue of identification, the rule of reasonable doubt, and the presumption of innocence, the trial court did not commit error in refusing the defendant's Instructions I, IV and V, even though said refused instructions correctly declared the law on said subjects, which we do not concede. [State v. Broyles, 317 Mo. 284, 295 S. W. 550; State v. Hicks, 319 Mo. 28, 3 S. W. (2d) 230.]

This disposes of all questions raised by the defendant's counsel in his brief and oral argument. The sufficiency of the evidence is not challenged. We have examined the information and the verdict, though not attacked, and find both sufficient. No reversible error appears either in the record proper or the trial proceedings. The judgment is accordingly affirmed. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, J.,* absent.