## THE STATE v. ANTHONY SCHLICHTER, Appellant.

### Division Two, February 23, 1915.

1. **RAPE:' Consent: Mental Incapacity: Knowledge of Defendant: Burden of Proof.** A man who has carnal intercourse with a woman mentally incapable of consent is not guilty of rape if he is ignorant of her infirmity and its extent and believes he has her consent; and where the woman yields an apparent assent, the State has the burden of establishing her mental incapacity and the defendant's knowledge thereof.

2. ———: ———: ———: **Evidence.** The evidence in trial for rape *held* to support a finding that the prosecutrix was mentally incapable of giving consent.

3. ———: ———: ———: **Knowledge of Defendant: Evidence.** The evidence in a trial for rape *held* not to show that the defendant knew of the prosecutrix's mental incapacity to give consent.

4. ———: ———: ———: ———: **Instructions: Conflicting.** In a trial for rape upon a female of infirm mind the court instructed that in order to convict the State must show that the defendant had sexual intercourse with the prosecutrix when she was so weak in mind as not to understand the nature and consequences of the act or to know right from wrong. *Held,* that the instruction is erroneous, in that, while purporting to state what is necessary in order to convict, it does not require a finding that the defendant knew of the prosecutrix's mental incapacity, and the defect was not cured by the giving of

263Mo36

State v. Schlichter.

another instruction covering the whole case and requiring such finding.

5. ——: ——: ——: **Opinion Evidence.** A witness in a prosecution for rape upon a female of infirm mind cannot testify as to his opinion whether the prosecutrix knew right from wrong.

6. ——: ——: ——: **Evidence: Of Jurors at a Previous Trial: Demeanor of Prosecutrix.** In a trial for rape upon a female of infirm mind, jurors at the trial of another on a like charge arising from the same transaction may testify that at the previous trial the prosecutrix was cool and collected while testifying, that she answered promptly, and looked directly at the person interrogating her. The defendant would thus be able to show any of the prosecutrix's actions at the previous trial which would tend to contradict any of her actions indicating mental incapacity while testifying at his trial.

7. ——: ——: ——: ——: ——: ——: **Conclusions of Witness.** Such jurors may not, however, testify that the prosecutrix's answers were responsive and intelligent, because that would be to testify to conclusions and not facts.

8. ——: ——: ——: ——: ——: ——: **Answering "I do not Know."** In a trial for rape upon a female of infirm mind, jurors in the trial of another on a like charge arising out of the same transaction may not testify that the prosecutrix did not at the previous trial answer "I do not know" to any question, unless it be shown that the questions to which she made that answer in this case were the same as questions asked her in the former.

9. ——: ——: ——: ——: ——: ——: **Opinion Evidence.** In a trial for rape upon a female of infirm mind, jurors at the trial of another on a like charge arising from the same transaction cannot testify that they were of the opinion, after observing her at the previous trial that the prosecutrix knew right from wrong and was capable of consent. Such testimony would invade the province of the jury.

Appeal from St. Louis City Circuit Court.—*Hon. Kent K. Koerner,* Judge.

REVERSED AND REMANDED.

*Ferris & Rosskopf* for appellant.

(1) The evidence shows that the prosecutrix was not of such unsound mind as to be the subject of a

charge of rape upon an insane female. It is not established that defendant knew of and took advantage of such mental infirmity of prosecutrix. Morrow v. State, 79 S. E. 63; Thompson v. State, 33 Tex. Crim. 472; Lee v. State, 43 Tex. Crim. 285; State v. Patrick, 107 Mo. 147; State v. Lawhorn, 250 Mo. 307; State v. Warren, 232 Mo. 200; State v. Cunningham, 100 Mo. 393; 2 Bishop on Criminal Law (6 Ed.), sec. 1121; 1 Wigmore on Evidence, sec. 496. (2) Mere insanity, even if known, does not make the act rape. The insanity must totally destroy the capacity to consent. State v. Warren, 232 Mo. 185; State v. Cunningham, 100 Mo. 382; 1 Wharton, Crim. Law (11 Ed. 1912), sec. 702, p. 881; 2 Bishop on Criminal Law (8 Ed.), sec. 1121. (3) The trial court erred in giving instruction No. 4. (a) Said instruction should have required the State to show and prove that defendant at the time, knew of such mental deficiency and inability to consent. State v. Warren, 232 Mo. 185. (b) And it is not sufficient in this respect that other instructions may have been given, requiring the State to prove that defendant knew of such mental deficiency. An erroneous instruction is not cured by a conflicting instruction, stating the law correctly. State v. Fellers, 140 Mo. App. 724; State v. Dearing, 65 Mo. 530; State v. Adams, 76 Mo. 355; State v. Cable, 117 Mo. 380; State v. Tatlow, 136 Mo. 678; State v. Herrell, 97 Mo. 105; Kelly's Criminal Law (3 Ed.), sec. 393. (4) If it be true, as assumed by the State, that the prosecuting witness was insane at the time of the offense charged, then as to that act she was not a competent witness. Lee v. State, 43 Tex. Crim. 286. (5) The trial court erred in excluding the testimony of the jurors at the previous trial. (a) Petit jurors may, in a subsequent action, testify to facts occurring at the former trial, if relevant, for example, as to statements of witnesses or what claims were allowed by the jury. Jones' Commentaries on Evidence (2 Ed.), sec. 766, p. 961; Woolfolk v. State, 85 Ga. 98;

Piatt v. St. Clair, 6 Ohio, 234; Taylor v. Larkin, 12 Mo. 103; State v. Duffy, 57 Conn. 525. (b) When the mental condition of an individual at a particular time is in issue, conduct, acts and declarations, after, as well as before the time in question, are admissible, if sufficiently near in point of time, and if they appear to have any tendency to show what that mental condition was at the time in issue. People v. Brent, 106 Pac. 110; Parrish v. State, 139 Ala. 16; People v. Koerner, 191 N. Y. 48. (c) A non-professional witness, who has detailed what he had seen and observed in the conduct of a person accused of crime, may give his opinion as to whether the accused had sufficient mind to discriminate between right and wrong in reference to his act. Smith v. State, 58 Ark. 139; Pflueger v. State, 46 Neb. 493; U. S. v. Guiteau, 1 Mackey, 546; Johnson v. Culver, 116 Ind. 278; Wilkinson v. Pearson, 23 Pa. 117; In re Wax, 106 Cal. 343; Bishoff v. Commonwealth, 123 Ky. 343. (4) A lay witness may give expression to an opinion that a person is sane without giving the facts upon which he bases his opinion, for in that case, the subject of the testimony would not give manifestations of certain eccentricities which usually mark the conduct of a mind diseased. State v. Soper, 148 Mo. 235; State v. Halloway, 156 Mo. 222; Lamb v. Lippincott, 115 Mich. 611; 1 Wharton's Criminal Evidence (10 Ed.), p. 844, sec. 417; 39 L. R. A. 305. (e) It was competent for defendant to prove that prosecutrix conducted herself in such a way as indicated she was feigning insanity at the trial of this case. Basham v. Commonwealth, 87 Ky. 440. (f) Where the defense is insanity, it is proper to permit the State, in rebuttal, to introduce in evidence the testimony of defendant on his former trials for the same offense. State v. Speyer, 207 Mo. 547. (g) A witness may be impeached by proving facts contrary to his testimony, by proving previous contradictory statements, or by showing conduct or acts of the witness inconsist-

ent with his testimony or tending in some manner to discredit the witness or his testimony.    16 Current Law, 2683; Railroad v. Ransom, 5 Ga. App. 740; Eswein v. Hodgkinson, 108 N. Y. Supp. 531; Wefel v. Stillman, 44 So. 203; People v. Fong Chung, 5 Cal. App. 587.

*John T. Barker,* Attorney-General, and *Lee B. Ewing,* Assistant Attorney-General, for the State.

(1)  (a)  The court properly overruled appellant's demurrer to the evidence at the close of the State's case and also at the close of the whole case.  The evidence was ample to sustain the finding of the jury. State v. Williams, 149 Mo. 496; Adams v. State, 114 Pac. 347; State v. Enright, 90 Iowa, 520; Gore v. State, 119 Ga. 418; Sandeufer v. Commonwealth, 143 Ky. 655; State v. Smith, 203 Mo. 695.  (b)  If there was any testimony tending to show that the prosecutrix was of unsound mind to such a degree as to render her incapable of consenting to sexual intercourse, it was the province of the jury to pass upon the question.  State v. Sharp, 233 Mo. 269; State v. Tatman, 228 Mo. 470; State v. Myers, 221 Mo. 469; State v. Huff, 164 Mo. 405.  (c)  In determining the question, the jury had the right to take into consideration the age, appearance and demeanor of the prosecutrix upon the witness stand, as well as all the other facts and circumstances in the case.  Wigmore on Evidence, secs. 1154-1160; 33 Cyc. 1472; State v. Philpot, 97 Iowa, 365; State v. Jones, 106 Ga. 365; State v. Enright, 90 Iowa, 520; State v. Simes, 85 Pac. 914; State v. Hubbard, 147 S. W. 260; Wigmore on Evidence, sec. 501.  (2)  The trial court did not err in giving instruction number four. This instruction properly declared the law and did not authorize the jury to find the verdict without their finding that appellant knew that the prosecutrix was of unsound mind.  All instructions must be read together

and when this instruction was read in connection with the other instructions in the case it was not misleading. State v. Wiseman, 238 Mo. 558; State v. Montgomery, 230 Mo. 671; State v. Mathews, 98 Mo. 125; State v. McKenzie, 177 Mo. 715; State v. Hall, 228 Mo. 469. (3) The court did not err in excluding the testimony of the jurors in the Fisler trial involving the same issues as in the present case. If there was error in excluding these witnesses it was not prejudicial.

WILLIAMS, C.—Upon an information charging him with rape, defendant was tried in the circuit court of the city of St. Louis, found guilty, and his punishment assessed at fifteen years in the penitentiary. Defendant duly perfected an appeal to this court.

**Rape.**

Prosecutrix was eighteen years of age at the time of the alleged offense and the information charged the defendant with "forcibly ravishing" the prosecutrix. During the progress of the trial, the defendant made a motion that the State be required to elect whether the case should be tried upon the theory that the offense was committed by force or on the theory that the prosecutrix did not have the mental capacity to consent. At the close of all the evidence, the State elected to submit the case to the jury on the theory that prosecutrix was incapable mentally of giving consent, and the case was, by the court, submitted to the jury on that theory.

The record embracing the testimony is very large. It will only be necessary to state such facts as shall have a bearing on the theory of the case upon which it was submitted to the jury.

The evidence on the part of the State tended to establish the following facts: Prosecutrix was eighteen years of age at the time of the alleged offense. When she was a baby and during her "teething time" she began to have spasms and continued to have spasms

at intervals until she was about seven years of age and was unable to walk until she was five years old. From eight until twelve years of age she suffered with St. Vitus's dance, resulting in a nervous breakdown at the age of twelve and she has continued to be very nervous to the present time. Her entire schooling consisted of about one month and on account of her nervous condition she was taken out of school. She knows the figures on the face of a clock and can tell which of the numbers the hands of the clock are on but cannot tell the time of day by looking at a clock. She knows the value of different coins but cannot add several coins together and tell what the total is. She can go to places where she has been but if she gets a block or so out of her accustomed route she becomes lost and confused. She never received gentlemen callers, but always played with children much younger than herself. Her father testified that she had always been bright "with the exception of her nerves;" that if any one would talk to her she would become excited and would stand dumb and could not answer; that going along the street, over a route to which she was accustomed, she would go along like any other lady. Her mother testified that she was not bright; that she had to tell her how to do everything and that the left side of the girl's body was not fully developed but was smaller than the right side. One of the neighbor women testified that prosecutrix was delicate and weak mentally; that she talked like a child eight years old but always seemed bright in company. Another neighbor woman testified that, in her opinion, prosecutrix was unsound mentally and seemed stupid in conversation and could not always answer questions readily but that she seemed to be bright when she went on errands. A policeman who lived in the neighborhood testified that he did not think that she was mentally sound because she was not as bright as girls of her age and

for the further reason that she always played with children.

Dr. Simon testified that he attended her the day after the occurrence and that she was very nervous. Upon examination he found the hymen broken and thought that it was freshly torn but would not swear that it was. He noticed an inflammation of the vagina, which, he said, might have been caused by two or three men having intercourse with her.

On the afternoon of February 5, 1913, the date of the alleged offense, prosecutrix was sent by her mother on an errand to the Westhus Carpet Company, on Broadway, in the city of St. Louis, to make a payment on a bill. Prosecutrix went to the store and paid the bill and was on Broadway, going toward her home, when she saw the defendant standing in front of a pool hall. On two former occasions, while prosecutrix and her mother were down town, the defendant had whistled at them when they passed. On the day in question, as prosecutrix passed the pool hall, defendant came out and said, "Little girl, ain't you cold?" Prosecutrix said, "Yes." Defendant told her that he would take her to his home where it was warm. She replied that she wanted to go home and defendant said, "What are you in a hurry to go home for?" Defendant then took prosecutrix by the arm and he and two other young men walked with her around the corner to the back part of Zang's saloon and into a small room back of said saloon and connected therewith by a door. This back room also had a door leading out into the back yard. When they were inside the back room, two of the girl's male companions went into the saloon and one remained in the room and had intercourse with her, and then he went into the saloon and one of the other young men came back into the back room and had intercourse with her, and then he went back into the saloon and then this defendant came into the back room and had intercourse with her and then went back

into the saloon, and another young man went into the
back room and had intercourse with her, and this con-
tinued until eight different men had intercourse with
prosecutrix.  She testified that they forced her to have
intercourse with them and threatened her, but, by the
greater weight of the evidence, it appears that she
made little, if any, resistance.  After the above oc-
curred the proprietor of the saloon went into the back
room to see what was going on, and upon finding the
girl there ordered her and her companions out of the
room.

Prosecutrix and one or two young men went out
the back door and down the street and some of the other
men went out the front door and joined her later on
the street.  From there they went to a livery stable
and prosecutrix and the defendant, accompanied by
the other five or six men, went up into a hayloft of the
stable.  Here defendant and three other men again
had intercourse with her and then the proprietor of the
livery stable upon hearing noise up in the hayloft
called up to them and asked who was up there, and
at that defendant and some of the other young men
jumped out of the loft window.  Prosecutrix attempted
to jump out of the window, but the son of the propri-
etor of the livery stable went up in the loft to see what
was going on and helped prosecutrix down the ladder
and told her to go home.  She started down the street
and rejoined some of her male companions.  The de-
fendant and the other young men then took prosecu-
trix a distance of a block or two to a room occupied by
one Gastroich.  She testified that in this room defend-
ant and the same young men again had intercourse
with her.  That it was about dark when they arrived
at the room and that she does not know how long they
stayed there, but finally they all went away and left
prosecutrix with Gastroich and she stayed all night
with him.  Gastroich was a workman in a nearby iron
mill and before daylight the next morning she went

with Gastroich to the iron mill where he worked. After daylight, prosecutrix and Gastroich walked up to Broadway, and there Gastroich went into a corner saloon and prosecutrix waited on a corner. A strange man then came out of the saloon and took prosecutrix over to another saloon. Later, on the same morning, the father of the prosecutrix found her walking along Broadway, looking up toward the sky, and took her home.

On cross-examination, prosecutrix admitted that about seven p. m., on the night in question, she was standing on Broadway talking to a young man by the name of Bowe and while she was so engaged her aunt and cousin passed her on the street and that she made no complaint to them. It appears from the transcript that the attorney who cross-examined prosecutrix had difficulty in getting her to look at him while he was cross-examining her and that she made no response to a great many questions asked her. She testified that when her father found her on the street the next morning and asked her where she had been she told him that she had stayed all night with an old lady. The proprietor of the livery stable testified that after he ran the young men away from the barn the prosecutrix came down the ladder from the loft and told him what her name was and where she lived. She also told him she knew her way home and she then left the stable and walked to the corner where her male companions had collected. He noticed her clothing was wrinkled but stated that her condition was not bad. Prosecutrix did not make any complaint to the livery stable proprietor, but when he talked a little rough to her she began to cry. The evidence shows that when the girl was taken home the next morning her underclothing was torn and she was in a bad nervous condition.

The evidence on the part of the defendant tended to establish the following facts: When prosecutrix passed the pool hall, she looked at defendant and smiled

and by the time he got out on the street she was about
a half block away, but she looked around and motioned
to him to follow her, which he did, overtaking her after
walking about a block. Defendant was 22 years old.
Defendant asked her where she was going and she re-
plied she was going home. Defendant asked her to go
with him and she refused, and defendant said all right
and started back to the pool hall, and she then said,
"Wait a minute," and then said she would go with
him. That they walked about a block on Broadway,
talking to each other, prosecutrix telling him about
helping her mother with the work at home. After they
walked about a block, defendant asked her to wait for
him until he went back to get his overcoat. He went
back to the pool hall and asked a man to loan him
twenty cents. He was unable to procure the loan and
remained in the pool room about fifteen minutes and
when he came out the girl was gone. It appears from
the evidence that the man from whom the defendant
wanted to borrow twenty cents left the pool room and
went down where the girl was standing and after hav-
ing a conversation with her took her to the back room
of Zang's saloon. Defendant, in about fifteen minutes,
went to Zang's saloon and a young man by the name
of Hare came out of the back room of the saloon and
told him there was a girl back there that wanted to
see him. He went back and found the prosecutrix in a
half sitting and half lying position on an overcoat on
the floor. Thereupon prosecutrix said, "Are there any
more boys out there?" Defendant told her there were
several, and she said, "Well, we may as well get
through," and defendant said, "All right." Defend-
ant then hugged her and kissed her for a while and
asked her if she would have intercourse with him, and
she consented, and he had intercourse with the prose-
cutrix in the back room of the saloon.

Defendant then went into the saloon proper and in
a few minutes thereafter he saw the prosecutrix and

two men out on the street. Defendant and another young man followed behind them and the prosecutrix accompanied by defendant and three or four others first went to Gastroich's room. After remaining there two or thre minutes, defendant and another young man left to go to a nearby saloon, and after going to the saloon returned to Gastroich's room, and upon returning there found prosecutrix and the other young men coming out of Gastroich's room and heard Gastroich order them away. After being put out of this room, prosecutrix and the defendant accompanied by the other young men went to a livery stable a short distance away. On the way to the livery stable, prosecutrix was joking with the young men and they were snow-balling each other. When they reached the livery stable they went up in the loft, and while up there two young men other than defendant attempted to have intercourse with prosecutrix, but they were prevented from having intercourse with her by the other young men present. After being there about five minutes they were run away by the proprietor of the stable and according to the testimony of the defendant he did not see the prosecutrix after he left the stable.

It appears that some of the young men were drinking and one or two of them were so much under the influence of liquor that they did not desire to go home at once but waited at different places two or three hours before going home. Gastroich testified that when he came home from work on the evening of February 5, he found the prosecutrix and three young men other than defendant in his room. He went to get some beer and whiskey and a short time after his return he ordered them out and that defendant came to his door just as he was putting the crowd out. This was early in the evening. About 2:15 a. m., prosecutrix and a young man by the name of Koenig knocked at his door and stated that they were cold and wanted in. The witness was then up, preparing his breakfast, prepara-

tory to going to his work at the foundry. That when he opened the door the prosecutrix came in and her male companion ran away and left the girl with him. He asked the girl if she would have some breakfast and she refused, and later he asked her if she would have intercourse with him and she refused and he said he did not have intercourse with her. About four a. m., he went to his work with a coworker who came by for him, and prosecutrix followed them to the iron mill and sat near the furnace to keep warm. Prosecutrix told witness that Koenig had gone to get some money so he could rent a room for her and that she was going to meet him at nine o'clock that morning. About 6:45 a. m., on that morning, witness and prosecutrix walked up to Broadway and he told the girl that she had better go home and he left her standing on the street while he went in a saloon and when he came out the girl was gone. Several of the workmen noticed the girl at the furnace that morning.

According to defendant's testimony, defendant and three or four other young men had intercourse with prosecutrix in the back room of the saloon but no one had intercourse with her either at Gastroich's room or at the livery stable.

I. Appellant contends that the court erred in overruling the demurrer to the evidence. In this behalf it is contended (1) that the evidence fails

**Consent: Mental Incapacity: Knowledge of Defendant: Burden of Proof.**

to show that the prosecutrix was mentally incapable of consenting to the act of intercourse; and (2) even though it should be held that there was sufficient proof to establish such mental incapacity yet the proof wholly fails to show that defendant had knowledge of such mental condition. The law applicable to the issues here presented was stated and fully discussed by this court in the fairly recent case

of State v. Warren, 232 Mo. 185. In that case the rule here applicable was stated by FERRISS, J., as follows:

"Carnal intercourse with a woman incapable from mental infirmity of giving consent, is rape, unless the man is ignorant of her infirmity and its extent, believes he has her consent, and has no intention to have intercourse without her consent.

"Where the woman in point of fact yields an apparent assent to the act, the burden is on the State to prove that at the time of the act she was incapable, because of mental disease, of assenting to or dissenting from the act, and that the defendant knew of such incapacity."

And further:

"It would not be enough to show merely that she was weak-minded, and that the defendant knew that she was so. 'The mere fact that a woman is weak-minded does not disable her from consenting to the act. . . . So long as the woman is capable of consenting, and does consent, the act is not rape, and this is true though the man may know that she is of weak intellect.' [State v. Cunningham, 100 Mo. l. c. 393.]"

The evidence upon the part of the State shows that prosecutrix was 18 years of age and that, at intervals,

**Evidence.** during the first seven years of her life had spasms and that until five years of age was unable to walk; that from eight till twelve years of age she suffered with St. Vitus's dance and thereafter continued to be very nervous; that she was not able to keep up with her class at school and for that reason was withdrawn from school after about one month's attendance; that she was unable to tell the time by the clock, talked like a child eight years of age and always played with children much younger than herself and never received the company of gentlemen. Going down town on an errand, she met the defendant, a stranger, and in company with him and two other strangers, she went to the back room of a

saloon and submitted herself to these three strangers and five others; a few minutes later she again submitted to the lust of this crowd of young men at the livery stable, and upon being run away from there the crowd went to a room where the same occurrence was repeated. The inference can be drawn from the testimony of the physician who examined her the following day that these were her first acts of sexual intercourse. The foregoing evidence leads strongly to the inference that she possessed such imbecility of mind as not to comprehend the immoral nature of the act and that she was therefore incapable mentally of consenting to the act of intercourse, and we are of the opinion that the jury were justified in so finding. The entire evidence considered, it would indeed be difficult to account for her action in descending so readily and in such a public and wanton manner, apparently, from the path of virtue to the very lowest depth of debauchery, upon any theory other than that her mind was such as to render her incapable of comprehending the immoral or wrongful aspect of the transaction.

But the more serious question arises as to the sufficiency of the proof concerning defendant's knowledge of her mental condition. To him she was a stranger and he knew nothing concerning her prior history. The evidence shows that she had surrendered to the two other young men before defendant's act. The father of prosecutrix testified that she would go along the street over a route to which she was accustomed "like any other lady." One of the neighbors, testifying for the State, said she would "seem bright in company." Another neighbor said she seemed stupid in conversation but seemed bright when she went on errands. The proprietor of the livery stable testified for the State. He said that after he ran the men away from the stable he talked with prosecutrix, scolded her and she began to cry. Upon inquiry she told him her name and where she lived and he thereupon permitted

her to depart and later saw her at the next street corner join the company of some of her male companions. Evidently he did not detect that she was an idiot or imbecile, because after he discovered that she was up in the hayloft with the young men he did not act as a man would ordinarily act if he thought a helpless or idiotic girl was being made the prey of lust. There is no evidence that her appearance on that day was such as to give the defendant knowledge of her true mental condition. In the case of State v. Warren, supra, in discussing this point, it was said:

"The real question is, assuming that the prosecutrix was so mentally infirm as to be incapable of giving assent, did the defendant, at the time, know of such incapacity? In answering this question, we are confined to the facts as they were apparent to the defendant at the time the act was committed. The testimony showing the family history of the prosecutrix, her virtuous character, and her condition on Sunday, after nine o'clock, might well satisfy the jury that the prosecutrix did not at the time of the act comprehend its moral nature, and could not give her assent. None of the facts shown by such testimony were known to defendant when the act was committed. He could only judge from the manner and conversation of the prosecutrix at the time of the act."

After carefully considering the entire evidence we have reached the conclusion that there was a failure of proof in this regard. It therefore follows that the judgment cannot stand.

II.   Instruction No. 4 was as follows:

"In order to convict in this case, it devolves upon the State to show and prove that the defendant, at some time, in the city of St. Louis and State of Missouri, had sexual intercourse with Della Amend, and that she, at such time, was a person of such weak and disordered mind

Conflicting Instructions.

that she could not comprehend or understand the nature and consequence of such an act, and did not at such time know right from wrong, and unless the State has so shown, you will find the defendant not guilty.''

This instruction is clearly erroneous. It undertakes to state what is necessary "in order to convict," and would therefore easily lead the jury to believe that if the facts therein required to be found were found then the defendant should be convicted. The instruction omits a very necessary requirement, to-wit, that the defendant *knew* that prosecutrix was mentally incapable of consenting. [State v. Warren, supra.] It is true, as contended by the learned Attorney-General, that instruction No. 1 covered the entire case and did require the jury to find that defendant did have such knowledge, yet that did not cure the defect in this instruction which also apparently undertook to cover the case. The jury would not know which to follow. Inconsistent or conflicting instructions should not be given. [State v. Tatlow, 136 Mo. 678, l. c. 684.] Other points are raised concerning instructions but upon careful examination we have reached the conclusion that the other instructions fairly and fully covered the law of the case and that the points urged are not of sufficient importance to merit further discussion.

III.  Upon the cross-examination of one of the State's witnesses, defendant's counsel asked the following question: "Then she [prosecutrix] knows what is right and what is wrong?" The State's attorney objected to the question on the ground that the answer would invade the province of the jury. The court sustained the objection and an exception was saved. Under the former rulings in this State the action of the court in sustaining the objection was proper. [State v. Palmer, 161

Opinion Evidence.

263Mo37

Mo. 152, l. c. 174; State v. Brown, 181 Mo. 192, l. c. 215. See also 17 Cyc. 238; 3 Wigmore on Evidence, 1937.]

IV. Defendant offered as witnesses four men who had served as jurors in the case of State v. Fisler, wherein Fisler was charged with the rape of prosecutrix. The Fisler case grew out of the same affair as the case at bar. Defendant offered to prove by these witnesses that they were present and heard the prosecutrix testify in the Fisler case and that (1) she was cool and collected while testifying; (2) she answered the questions promptly; (3) during all the time while testifying "she was looking directly at the person interrogating her;" (4) her answers were responsive; (5) she answered all questions in an intelligent manner; (6) she did not say "I don't remember" to any question; (7) that after observing her while in the court room at that trial the witnesses were of the opinion that prosecutrix was "capable of understanding right from wrong and capable of consenting to intercourse." The offer was rejected by the court and an exception was saved.

*Testimony of Jurors at a Previous Trial: Demeanor of Prosecutrix.*

We are of the opinion that the witnesses should have been permitted to testify as to points (1), (2) and (3). These facts disclosed her actions, appearance or demeanor while acting as a witness in the former case and if it could be shown that her demeanor as a witness on the former trial was different from her demeanor as a witness upon the present trial, it would no doubt supply facts of material aid to the jury in giving true weight or consideration to her demeanor in the present case.

The condition of prosecutrix's mind was one of the important issues in the case and defendant should have been given the opportunity to show any of her actions and demeanor upon the former trial which would tend to contradict any of her present actions or

demeanor indicating mental incapacity. If this were not allowed then feigned insanity or imbecility before the jury would be granted unfair protection.

On the other hand, error was not committed in refusing the offer as to points (4), (5), (6) and (7). Points (4) and (5) are objectionable because they state mere conclusions and not facts. Point (6) is irrelevant unless it were shown that the questions to which answers were made in the one case were the same questions to which the answer "I don't remember" was made in the other. Point (7) was objectionable because the evidence offered would invade the province of the jury and would therefore fall within the rule announced by the authorities cited in paragraph III of this opinion.

Other points are urged by appellant concerning the conduct of one of the jurors and the conduct of the State's attorney in making his argument to the jury, but since these are not such matters as will likely occur upon a retrial of the case, it becomes unnecessary to discuss the same here.

The judgment is reversed and the cause is remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion by WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.