THE STATE v. JAMES EVANS, Appellant.—133 S. W. (2d) 389.

Division Two, November 22, 1939.

*Phil M. Donnelly* and *J. Andy Zenge, Jr.,* for appellant.

400

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

COOLEY, C.—Appellant, defendant below and whom we shall call defendant, was convicted in the Circuit Court of Laclede County of murder in the second degree, for the killing of one Manuel Noble,

sentenced, pursuant to the verdict of the jury to ten years' imprisonment in the penitentiary, and has appealed. The homicide is virtually admitted—at least it is shown by all the evidence, is not denied and may be taken as an established fact. The only defense offered was the alleged insanity or mental incapacity of the defendant.

The defendant, at the time of the homicide, was a man thirty to thirty-five years of age, living with his father, Jack Evans, at the latter's home, a two room house or cabin. The father was not at home at the time of the homicide. On Sunday, September 4, 1938, defendant, James (or "Jim") Evans, Manuel Noble (the deceased), and several other young men were at the Evans' home. In the forenoon defendant and Noble engaged in a friendly wrestling match. Defendant was thrown and his head or scalp was cut by coming in contact with a rock or some object on the ground. He at the time manifested no ill feeling because of this episode, nor did Noble. Later Noble engaged in wrestling with others present and perhaps there were other wrestling contests between others present, but there was no manifestation of ill will or ill temper between or among any of those present. Later in the day, Noble, who was lying on the ground, suggested—it seems jocularly—that they ought to "tin can" a dog that was playing around in the yard, and have some fun. (We understand from the record that "tin canning" meant tying a tin can to the dog's tail.) When Noble made this suggestion, defendant, who was then "squatted" on his heels some eight or ten feet from Noble, leaped forward, without saying anything, sprang upon Noble and at once began stabbing Noble with a knife. He stabbed Noble several times before he could be "pulled off" by those present. Noble died the next day from the wounds so received. It does not appear that anything had been said or done by anyone present calculated to arouse resentment except the suggestion of Noble that they "tin can" the dog. It is not clearly shown whether the dog belonged to defendant or to his young nephew. It seems, however, that defendant was fond of the dog, whether it actually belonged to him or not. The dog was of no particular breeding or commercial value. In this connection we are reminded of the words of a Missouri song—(We quote from memory).

> "Makes no difference if he is a hound,
> You gotta quit kickin' my dog around."

There was evidence from both the State's and the defendant's sides tending to show that the defendant was a person of inferior mental capacity. He was classified as a moron by doctors, testifying both on behalf of the State and the defendant. He was characterized by most of the witnesses as "not bright," and we think the evidence as a whole justifies the conclusion that he was of somewhat subnormal mentality. Yet we think there was sufficient substantial evidence to sustain the finding which the jury made, as shown by its verdict, that

he knew right from wrong—knew that the act he was committing was wrong—in short that he was sane within the meaning of the law so as to be responsible in a criminal prosecution for such act. See for discussion of this proposition, State v. Duestrow, 137 Mo. 44, 38 S. W. 554. The principal instruction on insanity is substantially the same as instructions given and by this court approved in State v. Duestrow, supra, q. v. [See, also, on this point State v. Barbata, 336 Mo. 362, 80 S. W. (2d) 865; State v. Pagels, 92 Mo. 300, 4 S. W. 931.] There is, however, one paragraph in the instruction on insanity which we do not find in the instruction given on that subject in the Duestrow case. It reads:

"And in this connection you are further instructed that excitement or frenzy arising from passion of anger, hatred or revenge, no matter how furious, if not the result of a diseased mind, do not constitute legal insanity, and the jury should not confuse excitement, anger or wrath, or acts done under the influence of either or both for the purpose of revenge, with actual insanity, such as is recognized by law."

The criticism of this portion of the instruction is that it refers to excitement or frenzy, arising from passion of (or?) anger, hatred or revenge . . . if not the result of a diseased mind . . .", etc. The complaint seems to be twofold, viz.:—First, that there was evidence tending to show that defendant's mental condition was due not to a *diseased* mind but to an *undeveloped* mind, and that the instruction was therefore inaccurate and confusing; second, that there was no evidence of "anger, hatred or revenge."

As to the first contention: In addition to the main instruction on insanity the court gave, at the request of the State, the following instruction, No. 5. (We quote it in full because, while it also refers to voluntary drunkenness, that subject must be referred to hereinafter.) It reads:

"If you believe and find from the evidence, that the defendant, *from any cause whatsoever*, had become insane and irresponsible, in law, as explained in the foregoing instructions, and that he was so insane and irresponsible at the time of the killing, by reason of *any mental disease or disorder arising from any cause whatsoever*, then you will find the defendant not guilty, although you may believe that the defendant killed Manuel Noble while he was intoxicated or drunk.

" 'Drunkenness' is a species of insanity and is attended with a temporary loss of reason and power of self-control; drunkenness, however, is voluntary, brought on by the act of the party, while insanity proper is an affliction of Providence, for which the party affected is not responsible.

"Such insanity is a full and complete defense to a criminal charge, drunkenness is none; therefore, if you believe from the evidence that the defendant, James Evans, alias Jim Evans, voluntarily made him-

self intoxicated, and while so intoxicated, killed Manuel Noble in a fit of drunkenness or temporary insanity, which was the result of that intoxication, then he is responsible in law for such killing and you should so find.'' (Italics ours.)

Also the court gave, at the request of defendant, the following instructions, Nos. 6 and 7:

### No. 6.

''The Court instructs the jury that if you find and believe from the evidence that the defendant, Jim Evans, is a man of approximately thirty (30) or thirty-five (35) years of age, and if you further find and believe from the evidence that the defendant over twenty (20) years ago lived in the vicinity of Branch, Camden County, Missouri, and if you further find and believe from the evidence that defendant was of unsound mind while he lived in the vicinity of Branch, Camden County, Missouri, or at any time since leaving the vicinity of Branch, Camden County, Missouri, prior to the alleged killing, then the presumption of the law that he was sane and of sound mind at the time of said killing is removed and repelled; and in case you shall believe from the evidence that he was of unsound mind when he lived in the vicinity of Branch, Camden County, Missouri, or at any other time since then and prior to the killing, as aforesaid, then and in that case the law presumes that such unsoundness of mind continues up to and existed at the very time defendant struck deceased the alleged fatal blow, and in that case the defendant is not required to prove that he was of unsound mind at the time of said killing, but it devolves upon the State to prove that at the time of said killing defendant was sane and knew the right from the wrong.''

### No. 7.

''The Court instructs the Jury that if you believe from the evidence that at the time defendant struck and stabbed the deceased his mind had been so far impaired or destroyed by disease that he was unconscious at the time of committing the act that it was wrong and that he ought not to do it; or that he was irresistably impelled to the commission of the act by an insane impulse from a diseased mind and had not the ability to resist that impulse or to control his actions and choose between right and wrong, then you will find the defendant·not guilty.''

It will be noted that in Instruction No. 7 defendant predicated his claimed insanity upon the fact (if found) that his mind ''had been so far impaired or destroyed by disease . . .,'' etc. Defendant now contends that there was *no evidence* that his mind ''had been *impaired by disease.*'' It would seem that if there was technical error in the State's instruction in that respect defendant joined therein and therefore may not now complain. But we need not and do not decide the question in that ground. The State's Instruction No.

told the jury that if defendant *from any cause whatsoever* had become insane and irresponsible and was so insane and irresponsible by reason of any mental disease *or disorder arising from any cause whatsoever* at the time of the killing he should be acquitted. The lay witnesses who testified for defendant to the effect that, in their opinion, he was not a person of sound mind, either used the term "not of sound mind" or equivalent expressions, or that he was "not bright." The medical witnesses, while saying that he was a moron, whose mind had not developed normally, did not say whether or not such lack of development was due to some diseased condition. What is "disease," or a " diseased condition" such as would prevent normal mental development? We shall not attempt a discussion of this—it seems to us—technical question. We are not experts in such matters and the record before us does not show. Suffice it to say that this question appears to have been fought out below on the theory, on defendant's side, that he was a person of deficient mentality resulting from lack of mental development rather than from *disease* as the term is sometimes construed, while on the State's side there was evidence tending to show that, while he was perhaps not as "bright" as most people of his age, yet he had sufficient mind to know right from wrong and to know that the act he was committing was wrong. Under the evidence it was a question for the jury and we are satisfied that, reading the instructions together, as they must be read, and under the evidence, the jurors fully understood the issue submitted to them and were not misled or confused by any technical error, if any there was, in the State's instruction.

As to the second contention relative to this instruction : It is true that no witness testified, in so many words, that defendant appeared to be angry after he was thrown and his head was cut in the wrestling match in the forenoon. But, for all that, he may have been. Besides, there was the remark of Noble, immediately preceding the fatal assault, about "tin canning" the dog. At the time of attacking Noble defendant exhibited signs of fierce passion of some sort. Immediately, or very soon, after being "pulled off" of Noble defendant left the scene and soon thereafter returned, armed with a shotgun. Assuming, as we must, in view of the jury's finding, that defendant was sane in the legal sense, we must hold that, under the evidence, this particular phase of the case was properly submitted to the jury.

It is contended that there was no evidence to justify submission of the question of drunkenness. While it is true no witness testified definitely that defendant was drunk when he assaulted Noble there was evidence that he had been drinking intoxicating liquor very shortly before that time,—nearly enough before that the effect thereof may still have been operative,—and that when under the influence of liquor, as he frequently was, he was inclined to be easily irritated, quarrelsome and violent. In view of this evidence and of

defendant's conduct we cannot say that there was no evidence to justify submission to the jury of the issue of voluntary drunkenness. The *form* of the instruction by which that question was submitted is not complained of. This point must be ruled against appellant.

■ Defendant complains of the closing portion of the State's Instruction No. 3. By that instruction the court told the jury what facts must be found in order to authorize conviction and that if they found the facts as hypothesized they should find defendant guilty of murder in the second degree "and unless you so find the facts you should not find defendant guilty of murder in the second degree." The complaint is as to the above quoted closing sentence. Defendant argues that it should have directed that unless the facts were found as hypothesized the jury should find the defendant "not guilty" (at all) instead of not guilty of murder in the second degree.

We perceive no substantial merit in this contention. The court did not submit murder in the first degree nor manslaughter. The only offense submitted to the jury was murder in the second degree. To avoid possible misunderstanding we observe that there is no complaint of the court's failure to submit murder in the first degree or manslaughter. Defendant would not be in position to complain and does not complain of the court's failure to submit first degree murder, so we need not consider whether or not the evidence would have warranted submission of that degree of crime; and there was clearly no evidence calling for an instruction on manslaughter. By other instructions given the jury were told that if they found defendant mentally irresponsible (as defined) they should acquit. The wording of the closing portion of said Instruction No. 3, above quoted and now complained of, whether technically correct or not, could not have prejudiced defendant.

■ Defendant also complains of the court's refusal to give his requested Instructions A, B and C. By those instructions defendant sought to submit, in varying language, the issue of his mental incapacity and irresponsibility. We think that issue was sufficiently submitted and explained in the instructions which were given. No useful purpose can be served by multiplying instructions upon an issue which is sufficiently covered by a fewer number.

■ Complaint is also made that the court refused to permit certain lay witnesses to testify that in their opinions defendant did not know right from wrong. Questions calling for that kind of opinion were propounded to one or two lay witnesses and the State's objections thereto were sustained. However, the same witnesses (and others) were permitted to and did testify that in their opinions (based on circumstances detailed) the defendant was not of sound mind, or, in some instances, not as "bright" as the ordinary person of his age. The court was on the whole quite liberal to defendant in allowing ex-

pressions of opinion by lay witnesses to the effect that defendant was of unsound mind.

Now, as to the exact point that said lay witnesses should have been permitted to state that in their opinions defendant did not know right from wrong, this court has held that such expression would be an invasion of the province of the jury and is incompetent. [See State v. Schlichter, 263 Mo. 561, 577, 173 S. W. 1072, 1077; State v. Palmer, 161 Mo. 152, 174, 61 S. W. 651; State v. Brown, 181 Mo. 192, 215, 79 S. W. 1111.] The Schlichter and Brown cases were cited by this court with approval in State v. McCann, 329 Mo. 748, 763, 47 S. W. (2d) 95, 99 [10].

■ It is urged that the court erred in admitting in evidence a written statement made by defendant after his arrest and while he was in custody of the officers, because defendant was not then represented by counsel and was not advised that he did not have to answer questions or that what he said might be used against him, the statement having been made largely in response to questions propounded by the officers. There is no contention and no showing in the record that the statement was elicited by promises of leniency or hope thereof held out as an inducement to defendant to make it, or by threats, coercion, "sweating," or mistreatment of any kind by the officers,—in short nothing to indicate that the statement or confession was not voluntary. Defendant's objection was on the ground that he was mentally incapable of knowing what he was doing or saying and that he was under arrest and was not represented by counsel and not advised that his statement might be used against him. As to defendant's mental condition and whether he understood what he was saying the statement itself indicates that he did understand. But that was a question for the jury. The facts that he was under arrest, not represented by counsel and not advised that the statement might be used against him do not render the statement inadmissible, there being nothing in the record indicating that any improper methods were employed to induce it or tending to show that it was not voluntary. We discussed this question in State v. McGuire, 327 Mo. 1176, 39 S. W. (2d) 523, which see, with cases there cited. [See, also, on this point State v. Hoskins, 327 Mo. 313, 36 S. W. (2d) 909.] There was no prejudicial error in the admission of the statement.

■ Complaint is made of certain remarks of the prosecuting attorney in argument to the jury to the effect that if defendant were acquitted on the ground of insanity and sent to an asylum the asylum authorities might later find him to be sane and release him, whereupon he would come back "with murder in his heart." Defendant objected to that remark, stating no reason. The court, however, sustained the objection, remarking that there was no evidence "that he would come back with that in his heart." No request was made for a further ruling nor exception taken to the court's failure to rule

further, nor was there any request that State's counsel be reprimanded. Neither was there any further reference by the prosecuting attorney to the matter objected to. In these circumstances there is no just ground for reversal in this episode.

There are some general complaints in defendant's motion for new trial and in his brief to the effect that the verdict was the result of passion and prejudice, against the weight of the evidence, etc. We think they are not of sufficient merit to require discussion. Defendant appears to have had a fair trial and the verdict is supported by substantial evidence. We find no prejudicial error in the record. The judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.