State v. Floyd Cochran, Appellant.—No. 40256.—203 S. W. (2d) 707.

Court en Banc, July 14, 1947.

*Henry W. Simpson* and *Joseph M. Walsh* for appellant.

*J. E. Taylor*, Attorney General, and *W. Brady Duncan*, Assistant Attorney General, for respondent.

HYDE, J.—Defendant was convicted of murder in the first degree. He was sentenced to death, and has appealed.

Defendant was found guilty of the murder of Marylou Jenkins by strangling her, by tying an electric light cord tightly around her neck, after raping her in her home on February 5, 1946. She was found dead by her mother when she returned to her home on the morning of February 6th. Defendant confessed to this murder on February 26th, when he told the officers who were questioning him that he could show them how he did it better than he could tell them. He was taken to the Jenkins' home where he reenacted the crime.

At the trial, defendant attempted to prove alibi and insanity and also to exclude this and other later confessions as involuntary. All of these issues were submitted to the jury on comprehensive instructions and no claim of error therein is made. The principal evidence of defendant's guilt consisted of these confessions although there was evidence of certain corroborating circumstances. The trial court held a preliminary hearing, with the jury excluded, before admitting any evidence of confessions, and, thereafter, overruled defendant's motion to exclude them. Defendant contends that these confessions were inadmissible as a matter of law, claiming they were obtained after long and continuous questioning of defendant, who was a person of low mental calibre, held incommunicado and without the advice of counsel. A conviction based on confessions must be reversed if the evidence conclusively shows they were involuntary; and this question should be decided on this appeal upon consideration of all of the evidence, both at the preliminary hearing and before the jury. [State v. Ramsey, 355 Mo. 720, 197 S. W. (2d) 949 and cases therein cited.] If the evidence is conflicting on this issue it is a question for the jury. [State v. Ellis, 354 Mo. 998, 193 S. W. (2d) 31, 193 S. W. (2d) 37.] Under such circumstances, when this issue is sub-

mitted to them on proper instructions, their decision should be held final.

 Defendant was taken to the county jail on Saturday, February 23rd about 3:30 P. M. The officers were called because he had attempted to drink lye water. Dr. A. W. Kampschmidt was called by the sheriff to treat him. He said he could not get anything out of him; that he gave his name as Ellis Cochran (his brother's name); that he "could not make out what was the matter with him, whether he was crazy or whether he was getting over a binge or whether it was something else"; and that he "thought the proper thing to do was to incarcerate him until he could determine what the trouble was." Thereafter, defendant's wife was found dead, from a gun shot wound, in their home; apparently by defendant's sister and brother who went there after Dr. Kampschmidt told them about examining defendant. (Defendant later plead guilty to the murder of his wife.) So far as the record shows he was not questioned by any officers until 10:00 P. M. on Sunday, February 24th, when he was brought to the city jail and questioned until about 3:00 A. M. Defendant's brother, Turner Cochran, was allowed to visit him at the county jail on Sunday afternoon, and he said he talked to him for 30 or 40 minutes. He said defendant told him that "he was playing like he was going to take some lye water and she (his wife) called the law on him." Turner went back later for another visit but was not permitted to see him until after he had confessed.

During the questioning on Sunday night, defendant admitted shooting the gun in his house but claimed his wife was not dead and he was taken to the undertaking parlors to view his wife's body. The officers said that he was given food and coffee during this period; that the questioning was at intervals; and that "he was allowed at different times to be without anyone talking to him." Some of the questioning Sunday night was about the Jenkins case. Defendant was not questioned about it again until about 8:00 P. M. the next night, Monday, February 25th. On Monday afternoon about 2:00 P. M. he was taken out to his home, where "he reenacted the scene of his wife's murder." Defendant was returned to the city jail about 4:30 P. M. and brought back clean clothes and his shaving kit. He was allowed to take a bath, shave, rest and have his evening meal. The officers who were present at the questioning on Sunday and Monday nights were the sheriff and one of his deputies, the chief of police of Columbia and two or three officers of the State Patrol.

Shortly after midnight, they said that defendant told them he could show them how he did it and he was taken to the Jenkins' home. They said he showed them how he knocked at the front door and called for Mrs. Jenkins between 10:00 and 11:00 P. M. on February 5th, and told them that when Marylou asked who was there, he gave his name and said "Mrs. Jenkins owes me eighty cents for

hauling garbage and I have come to collect the money.'' (Defendant had hauled garbage and trash for several years; and Mr. Jenkins had asked him to do some hauling from his place two or three months previously.) He said that Marylou told him Mrs. Jenkins was not at home and he asked her to pay him. He said she opened the door and then unlocked the screen door. He immediately pushed inside and pushed her back, causing her to fall over the arm of a divan. (Body bruises found at the autopsy corroborated this.) She screamed and he threw her on the floor, putting a blanket over her head to stifle her screams, until she quit struggling, and then raped her. Because he knew he was recognized, although he said she was ''out'', he got a long electric light cord (after first breaking off pieces from a lamp which he said were not long enough) from another room and tied it tightly around her neck. He demonstrated how he did this by tying it around a patrolman's arm. He also said that he tore a rag from her body and carried it with him until he entered the woods at the end of the street. (The state suggests that he might have used this to turn off the porch light over the door, which he said he did when he left the house.) He said there were lights in neighboring houses and he thought they might see him leave. He took the officers to these woods and pointed out the place where he said he threw it away, which was within four or five feet of the place where the officers had found a used sanitary napkin with a piece of a sanitary belt attached. There was testimony that, by comparison with a piece of belt and pad taken from the body of the dead girl, this was found to be the part missing from it. Defendant's statements were later reduced to writing in Columbia and again two days later in the office of the Superintendent of the State Patrol in Jefferson City, where he told the same story. However, these written statements were not offered in evidence.

Defendant's sister and his brother Ellis testified that they tried to see him after his brother Turner had told them he had visited him. Ellis said he went Sunday night and again on Monday. His sister said she went three times on and after Monday. They were refused permission to see him until after he had been taken to Jefferson City, which was done on the morning of his confession, and did not see him until about two weeks after he was arrested. Defendant did not testify at the preliminary hearing on the confession but took the stand before the jury. He did not then testify concerning his confession or his questioning. The only question he was asked concerning the crime was: ''Did you kill Marylou Jenkins?''; and he answered: ''no sir; I never.'' The State also introduced evidence of other later confessions, one being to a cell mate in the Jefferson City jail on March 17th.

Defendant's evidence concerning his mental condition was that he went only to the third grade in school; that he was rejected for

784

war time military service, the medical finding being: "Floyd Cochran is mentally disqualified for military service by reason of mental age less than 10 years"; and that he had been treated by a doctor, Dr. G. A. Bradford, who said he had known him all his life but that he never noticed anything wrong with him until five or six months before his wife died, when he seemed to be slipping. Dr. Bradford said he "could not get very much out of him and every time he would come it would be worse and worse." Defendant told him he could not sleep because "he was scared—he was afraid somebody was going to hurt him." When asked: "who do you think is going to hurt you?", he said: "Hitler." Dr. Bradford said he told his wife to put him in an asylum. Defendant was in his office with his wife on the day she was killed and he gave him some medicine (a sedative) to make him rest. There was also evidence of defendant's acts, claimed to show mental unsoundness, such as playing with his privates before other people, on two occasions, once in the presence of the officers who brought him to the county jail; and a statement that his wife had put poison in something that made him sick.

We cannot find that this evidence conclusively showed that defendant's confessions were involuntary. There was no evidence whatever of any threats or promises or mistreatment of any kind. He was being legally held on a warrant for the murder of his wife. Certainly there was ample evidence in the testimony of the officers to justify a finding by the jury that they were voluntary. We, therefore, hold that these confessions cannot be held involuntary as a matter of law and that the testimony concerning them was properly held admissible by the trial judge.

In this connection defendant contends that it was error to allow the chief of police to testify to overhearing defendant make an admission of guilt to Dr. Hoctor, who had examined him while he was in custody. Defendant says that since he did not consent to the examination, this amounts to compelling him to testify against himself. The chief testified that defendant, as he was leaving Dr. Hoctor, told him that he murdered the girl, and said that he placed the cord around her neck real tight and strangled her. He said that Dr. Hoctor had examined defendant as a psychiatrist, but that this statement was made after "the doctor had examined him and he had put his clothes back on." The chief thought the doctor's examination had ended "because he had released him and was talking to him in the adjoining room when Floyd made ▮ this statement to him." Defendant relies on State v. Newcomb, 220 Mo. 54, 119 S. W. 405; State v. Horton, 247 Mo. 657, 153 S. W. 1051; and State v. Matsinger (Mo. Sup.), 180 S. W. 856. These cases are not in point here. They were all rape cases in which the defendant was examined without his consent to determine whether he had a venereal disease, which fact tended to connect him with the crime. Here the examination was to deter-

mine defendant's sanity, which he himself put in issue and upon which issue he offered medical testimony.

We have just held that, under such circumstances, a defendant "could not be permitted to call as witnesses only those doctors whom he desired to call, and then claim the right to object as to other doctors who treated and examined him for the same condition." [State v. Sapp, No. 40,261, 356 Mo. 705, 203 S. W. (2d) 425 decided at present April 1947 Session, and cases cited.] When a defendant thus puts his sanity in issue, he waives all privilege either under the physician privilege statute [Section 1895, this and other references are to R. S. 1939 and Mo. Stat. Ann.] or under the self-incriminating section [Sec. 19, Art. II] of the Constitution, to exclude testimony of any doctors who have examined him for this purpose. [See People v. Esposito (N. Y.), 39 N. E. (2d) 925, 142 A. L. R. 956; Ingles v. People (Colo.), 22 P. (2d) 1109; see also 14 Am. Jur. 879, Sec. 160; 22 C. J. S. 998, Sec. 651.] Defendant obtained the trial court's ruling excluding all doctors, who examined him in custody, from testifying as to his sanity, which was more favorable than he was entitled to have. The testimony as to defendant's statement, which it is claimed was erroneously admitted, was not the testimony of a doctor but of a third party who was present at the time it was made to the doctor. There was at least substantial evidence to show that it was voluntarily made after the doctor's examination had ended, when he was about to leave defendant, and that it was not made for any purposes of medical treatment or diagnosis, so that it was of an unprivileged character. [See Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S. W. 1043.] If the doctors could properly testify, surely there was no error in admitting this testimony as to what defendant said under these circumstances. We, therefore, overrule this assignment.

Defendant further contends that the court erred in admitting in evidence the sanitary pad, found by the officers at the place where defendant told them he threw it away, because it was not properly identified. This point was not raised in defendant's motion for new trial and, therefore, was not preserved for review. In any event, we think it to be without merit because the finding of this pad in this place was a circumstance corroborating defendant's statement. Both parts of the belt and pad were before the jury so that they could properly determine its identity and the weight and value of this evidence.

Defendant makes no contention concerning form of information, verdict, allocution or judgment and sentence, and we find them to be in proper form, but briefs the following further assignments of his motion for new trial. Defendant claims error in refusal of his motion (made at the time the jury was to be qualified) for the appointment of a commission to examine him as to his sanity. The case had been set for trial for May 27th (during the April 1946 Term) and defendant's motion to quash the panel (because negroes were not

summoned) was sustained and a new panel summoned. Defendant then offered a letter from defendant's deceased wife to her brother, dated October 29, 1945, concerning defendant's mental condition and also offered to prove that Dr. Bradford had advised her that he should be sent to an asylum. Defendant says the inquiry should have been ordered because defendant was without funds to employ a psychiatrist to examine him. (Several physicians, experienced in treatment of mental diseases at state hospitals, did examine him; but, on defendant's objection, their testimony that he was sane was excluded when offered in rebuttal at the trial.) ██ Defendant cites no authority for such a proceeding in this state. For a review of the cases on this subject see Annotation 142 A. L. R. 961, from which it appears l. c. 1004, that it is within the discretion of the court to submit this question to the trial jury where no statutory procedure is provided. Our statute, Section 4046, provides for a sanity hearing by a special jury if the defendant becomes insane "after his indictment and before his trial." Section 4047 provides for commitment to an asylum if defendant is then found insane and Section 4048 provides for his return for trial on the crime charged, when restored to reason. Section 4049 provides that when a person is tried and acquitted on the sole ground of insanity at the time of commission of the offense charged, "the jury shall further find whether such person has or has not entirely and permanently recovered from such insanity"; and if such recovery is found he is to be discharged, otherwise to be sent to an asylum. We construed these sections in State v. Crane, 202 Mo. 54, 100 S. W. 422, and State v. Church, 199 Mo. 605, 98 S. W. 16 and held (202 Mo. l. c. 80-81) : "If the accused is insane at the time of the commission of the offense with which he is charged, this is tried by the jury charged with the trial of the indictment or information, and in this way his insanity, if proven, is available as a defense . . . it must be held that the statutory provisions on that subject are controlling, and that whatever the rule might have been at common law and in other states, our statute must govern and hence the right of a trial of the question of the insanity of a defendant in advance of the trial of the charge upon which he is indicted, only applies when such person becomes insane after his indictment, and that where his plea is that he was insane at the time of the commission of the offense, the court should not direct an independent inquiry into his sanity, but leave him to make such defense on his trial." [See also 14 Am. Jur. 803, Sec. 47; 71 A. L. R. 1017 Annotation.] We, therefore, overrule this assignment.

██ Defendant claims error in permitting Mrs. Jenkins, the mother of the murdered girl, to sit near the jury both before and after her testimony and remain there crying and sobbing. Defendant claims this inflamed and prejudiced the jury. At defendant's request all witnesses were excluded from the court room during the trial except

Mr. and Mrs. Jenkins. No objection was made to excepting them. Mrs. Jenkins was the first witness for the state. At the conclusion of the direct examination of the second witness, defendant's counsel objected to Mrs. Jenkins remaining near the jury "in the space reserved for attorneys and members of the press." The court sustained the objection and said he would call a recess after the cross-examination of the witness. Defendant's counsel said to the prosecuting attorney: "After recess, you can ask her to sit out in the courtroom." There was no further objection or request and Mrs. Jenkins was called back for further cross-examination by defendant's counsel immediately after the recess. The record shows a disagreement of counsel as to her conduct. The Court observed it and acted in accordance with the only request made. We, therefore, overrule this assignment.

Defendant also claims error because the sheriff and his deputy Powell were allowed to be in charge of the jury when they were witnesses for the state concerning his confession. Defendant says this might result in undue weight being given to their testimony. No objection was made until after the preliminary hearing before the court on the voluntariness of defendant's confession at which the sheriff and Powell testified. This was at the close of the afternoon session of the first day of the trial. Defendant's motion for a mistrial was overruled but the sheriff and Powell were declared by the court to be thereafter disqualified to have charge of the jury. Deputies Fenton and Level were then sworn to keep the jury together and were placed in charge of the jury. No further objection or request was made and this action was taken before the sheriff and Powell testified before the jury. We hold that there was no prejudicial error in the court's action.

Defendant also claims error in refusing to admit the letter from defendant's deceased wife to her brother, written in October 1945, citing State v. Hicks, 319 Mo. 28, 3 S. W. (2d) 230. The letters held admissible in the Hicks case were letters written by defendant and those written to him, or to a member of his family to be shown to him, by the persons he killed. [See also State v. Kring, 64 Mo. 591.] The letter in this case was not to or from defendant and was not seen by him. It stated Mrs. Cochran's fear that something might happen; that the doctor had told her that he should be under a doctor's care; that "Floyd is round telling people I'm *poising* him so I can get his home"; and that "every time he gets mad he takes my money away from me." It was, of course, hearsay evidence and defendant points out no exception to the hearsay rule under which it would be admissible. We held in State v. Tarwater, 293 Mo. 273, 239 S. W. 480, that hearsay was not proper to prove insanity. [See also 22 C. J. S. 1235, Sec. 724; 20 Am. Jur. 407, Sec. 461.] We hold that there was no error in excluding this letter.

Defendant's final claim of error, found in his motion for new trial, is on the statement of the prosecuting attorney in his argument to the jury to the effect that there was no evidence in the case that the defendant did not know right from wrong. Defendant says that this tended to give the jury the impression that before they could find insanity there would have to be some positive testimony from a witness that defendant did not know right from wrong. Defendant says that no witness could be allowed to so testify because such an opinion would be an invasion of the province of the jury, citing State v. Brown, 181 Mo. 192, l. c. 215, 79 S. W. 1111; and State v. McCann, 329 Mo. 748, 47 S. W. (2d) 95. In the Brown case, the question was clearly improper because the doctor was asked to say whether the defendant knew the difference between right and wrong when in a drunken condition at the time of the murder. The court therein cited State v. Palmer, 161 Mo. 152, 61 S. W. 651, in which a doctor, who had never examined the defendant, was asked whether he would be capable of distinguishing his acts of right and wrong under certain stated circumstances of excitement. The McCann case cited the Brown case and State v. Schlichter, 263 Mo. 561, 173 S. W. 1072, in which this question was asked a lay witness. [See also State v. Evans, 345 Mo. 398, 133 S. W. (2d) 389, which held it improper to ask a lay witness this question.] However, what was said in the McCann case on this subject was obiter, because there was no such question asked therein. The question presented and decided in the McCann case was on the improper limitation of the doctor's testimony preventing him from making any explanation as to the mental condition of the defendant and requiring a "yes" or "no" answer only, as to insanity.

It is not a valid objection on a proper subject of expert testimony that the opinion of a qualified expert witness will invade the province of the jury, so long as the question does not call for a conclusion of law. [Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S. W. (2d) 601; Mann v. Grim-Smith Hospital and Clinic, 347 Mo. 348, 147 S. W. (2d) 606; Cole v. Uhlman Grain Co., 340 Mo. 277, 100 S. W. (2d) 311.] "An expert witness, in a manner, discharges the functions of a juror" because, in matters in which intelligent conclusions cannot be drawn from the facts by inexperienced persons, experts, "who by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion." [Benjamin v. Metropolitan Street Railway Co., 133 Mo. 274, 34 S. W. 590.] In State v. Sapp, No. 40,261, supra, we reaffirmed the rule that "the mental test of criminal responsibility is whether the accused was capable of distinguishing right from wrong as applied to the particular act." [See also Fisher v. U. S., 328 U. S. 463, 66 S. Ct. 1318, 90 L. Ed. 1382; 1 Warren on Homicide 189.] The jury were given this test in the instructions in this case. Undoubtedly it would be im-

proper to ask an expert for his opinion as to whether the defendant was capable of distinguishing right from wrong at the time of the commission of the particular act involved in the case, when he was not under his observation, because this would amount to telling the jury how to decide the case, and that is the effect of the above cited cases. However, we see no good reason why a doctor who has observed, treated or examined a defendant should not be permitted to give his opinion as to whether his mental condition was such at the time of his examination that he was capable of understanding the nature and quality of his acts so as to be able to distinguish right from wrong generally or at all.

In this case, the matter arose on cross-examination of defendant's witness, Dr. Bradford, as follows:

"Q. You don't claim to be a psychiatrist and don't attempt to tell the jury that this man don't know right from wrong, do you?

"A. Not by any means."

An objection made by defendant's counsel was withdrawn, and there was no further cross-examination. It is to be noted that the question was not directed to any particular past time or act. The prosecuting attorney in his argument said: "there isn't a scintilla of evidence that he didn't know right from wrong" and quoted what Dr. Bradford had said. We think it was material upon the question of defendant's sanity, submitted to the jury by the instructions, and it was proper for him to argue that question to them. Perhaps his statement was too broad but it was the jury's function to weigh the evidence on that issue. Furthermore, since Dr. Bradford's statement went in without objection, we do not see how it could be improper for the prosecuting attorney to mention it. We find no error in the action of the court in overruling defendant's objection to this part of the argument.

 Defendant makes two other allegations of error, which were not stated in his motion for new trial. These are that "the record in the trial court is replete with references to the murder by defendant of his wife some days after the murder of the Jenkins girl to such an extent that justice requires that defendant be granted a new trial in view of the extremely prejudicial and inflammatory effect upon the jury of said references"; and that "the argument of the State's Attorney 'he (defendant) took the life of his own wife, he took the life of this girl . . .' is so highly prejudicial and inflammatory as to entitle the defendant to a new trial, and the trial court erred in failing to reprimand the State's Attorney therefor, and in failing to declare a mistrial." These assignments are not preserved for review; but in any event are without merit because the murder of defendant's wife was first brought into this case by defendant's counsel. It was referred to several times by him before the jury in examining the officers concerning the questioning and

confessions of defendant. Furthermore, defendant's objection to the prosecuting attorney's reference to it in his argument was sustained. The court said, concerning defendant's request for reprimand: "He won't make it any more"; and there was no further reference to it. No request was made for a mistrial. Defendant was ably represented and we are impressed from reading the record that he had a fair trial.

The judgment is affirmed and sentence ordered executed.

Date of execution ordered on and for Friday, August 29, 1947. All concur.